MAURICE M. WILLS AND GERTRUDE E. WILLS, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 1956-66.    Filed June 14, 1967.

*Francis J. Butler*, for the petitioners.
*Gary C. Randall*, for the respondent.

FAY, *Judge:* Respondent determined deficiencies in petitioners' income tax for the calendar years 1962 and 1963 in the amounts of $1,475.78 and $7,091.22, respectively.

Other issues raised in the notice of deficiency for 1962 and 1963 were conceded by petitioners prior to the trial herein. Therefore, the only issues for decision are:

(1) Whether petitioners' tax home in 1962 and 1963 was Los Angeles, Calif., and they were, therefore, not entitled to deduct living and travel expenses incurred by petitioner Maurice Wills while he was in Los Angeles during those years;

(2) Whether the fair market value of an MG automobile received by petitioner Maurice Wills in 1962 as the most popular Dodger is properly includable in petitioners' income in 1962; and

(3) Whether the fair market value of the S. Rae Hickok award

received by petitioner Maurice Wills in 1963 as the prior year's outstanding professional athlete is properly includable in petitioners' income in 1963.

Some of the facts were stipulated and as stipulated are so found by this reference.

Petitioners filed Federal joint income tax returns on the cash basis for the calendar years 1962 and 1963 with the district director of internal revenue for the District of Washington, Tacoma, Wash.

Petitioner Maurice Wills (hereinafter referred to as petitioner) is, and was during the years 1962 and 1963, a professional baseball player. In 1962 and 1963, he was employed by the Los Angeles Dodgers (hereinafter referred to as the Dodgers), whose club home is Los Angeles, Calif.

By the terms of the 1962 and 1963 contracts between petitioner and the Dodgers, petitioner was to be paid semimonthly at the Dodger headquarters in Los Angeles, Calif. In 1962 and 1963, petitioner spent a minimum of 87 days in Los Angeles, Calif., as a member of the Dodger baseball team. In 1963, petitioner spent an additional 4 days in Los Angeles in connection with the World Series and additional time in preparation for a nightclub routine.

Petitioner first purchased a house in Spokane, Wash., in 1958. He and his family used this house as a personal residence. In January 1962, petitioner purchased a second house in Veradale, Wash., on the outskirts of Spokane, Wash. Petitioner and his family vacated their first Spokane residence and moved into the second house in which they resided during the years 1962 and 1963. Petitioner retained the first house and used it as rental property until he sold it in 1965. Petitioner's wife and five children resided in Spokane during the 2 years in issue. When petitioner was in Spokane, he stayed at his residence.

Petitioner spent a total of 138 days and 96 days of the years 1962 and 1963, respectively, in Spokane, Wash., and lived during that time at his Veradale home.

During 1962 and 1963, petitioner did public relations work for the Dodger minor league team, the Spokane Indians located in Spokane. Petitioner received $5,000 in 1962 and 1963 from the Dodgers for his work in Spokane.

When in Los Angeles, petitioner lived with the pastor of the church that he attended in Los Angeles. Petitioner paid rent for the opportunity of having these accommodations.

In 1962, petitioner broke the major league baseball record for the most stolen bases in one season, a record that had been set some 47 years earlier by Ty Cobb. In the same year, petitioner had a .299

batting average and tied with three other ball players for the most triples hit in the National League. Petitioner led the Dodgers in most games played, most times at bat, and most runs scored. Petitioner was the subject of leading magazine articles in 1962, appeared in the 1962 All-Star game where he was voted "player of the game," was voted the "most valuable player" of the National League, and received awards from the Associated Press as "Athlete of the Year," the Sport Magazine as "Man of the Year," the Baseball Writers as "Athlete of the Year," and California as "Athlete of the Year."

In October 1962, following the last Dodger baseball game of the season, petitioner was awarded an MG automobile with a fair market value of $1,731. Petitioner kept the MG until 1964, at which time he traded it in on another car and was allowed $1,318.52 as a trade-in. The automobile was awarded by the Millard Automobile Agency of Los Angeles. The automobile was awarded as the result of a vote taken at a Dodger baseball game several days previously to determine the most popular Dodger. The automobile agency distributed printed programs. Petitioner was selected as the most popular Dodger and received the automobile.

In January 1963, petitioner received the S. Rae Hickok belt awarded annually to the outstanding professional athlete of the prior year.[1] The predominant criterion in electing each year's recipient was excellence in athletics. The award was made for petitioner's activities in 1962. The inscription on the belt states that it is given to the outstanding professional athlete. Petitioner could have disposed of the Hickok belt at any time after he received it.

In his notice of deficiency respondent asserted that (1) the fair market value of the MG automobile that petitioner received as a prize or award is taxable as ordinary income in the year 1962 within the purview of section 74(a); (2) the fair market value of the Hickok belt that petitioner received as a prize or award is taxable as ordinary income in the year 1963 within the purview of section 74(a); and (3) that deductions of $3,169 and $3,858 claimed for travel expenses in 1962 and 1963, respectively, were not deductible to the extent of $1,239 and $2,095, respectively, because petitioner had not established that travel, meals, and lodging were incurred while away from home as required by section 62.

OPINION

The first issue for decision is whether expenditures made by petitioner in 1962 and 1963 for travel, meals, and lodging in Los Angeles

---

[1] The S. Rae Hickok belt was jewel-studded, contained 27 one and one-half carat diamonds, simulated stones, and had a 3½-pound gold belt buckle. It is stipulated that the value of the belt at the time of receipt was $6,038.19. One of the gems in the belt was subsequently removed by and used in a ring for petitioner's wife.

are deductible as travel expenses under section 62(2)(B) [2] or section 162(a)(2).[3] The Supreme Court in *Commissioner* v. *Flowers*, 326 U.S. 465, 470 (1946), stated:

> Three conditions must thus be satisfied before a traveling expense deduction may be made under § 23(a)(1)(A):
>
> (1) The expense must be a reasonable and necessary traveling expense, as that term is generally understood. This includes such items as transportation fares and food and lodging expenses incurred while traveling.
>
> (2) The expense must be incurred "while away from home."
>
> (3) The expense must be incurred in pursuit of business. * * *

Respondent submits that the expenditures in question were petitioner's personal living expenses and are, accordingly, not deductible. In support of this position, respondent argues that Los Angeles must be considered petitioner's home for tax purposes and, therefore, the amounts expended by petitioner in Los Angeles were not incurred while away from home within the meaning of section 62(2)(B) or section 162(a)(2). To the contrary, petitioner argues that, under the particular facts of this case, Spokane should be considered as petitioner's home for tax purposes and, therefore, the expenditures incurred by him in Los Angeles were incurred "while away from home" within the scope of these sections.

The instant question relating to the location of a professional baseball player's tax home is a matter of first impression for this Court. However, general principles governing the deductibility of travel expenses are equally applicable in determining petitioner's tax home as a professional baseball player.

Consideration of *Commissioner* v. *Flowers, supra,* is relevant at this point. In *Flowers,* the Supreme Court denied any deduction for expenses incurred when the taxpayer lived in one city (Jackson, Miss.) and worked in another city (Mobile, Ala.). It held that by choosing to live at a distance from his place of employment the taxpayer could not convert commuting and living expenses into business expenses

---

[2] SEC. 62. ADJUSTED GROSS INCOME DEFINED.

For purposes of this subtitle, the term "adjusted gross income" means, in the case of an individual, gross income minus the following deductions:

\* \* \* \* \* \* \*

(2) TRADE AND BUSINESS DEDUCTIONS OF EMPLOYEES.—

\* \* \* \* \* \* \*

(B) EXPENSES FOR TRAVEL AWAY FROM HOME.—The deductions allowed by part VI (sec. 161 and following) which consist of expenses of travel, meals, and lodging while away from home, paid or incurred by the taxpayer in connection with the performance by him of services as an employee.

[3] SEC. 162. TRADE OR BUSINESS EXPENSES.

(a) IN GENERAL.—There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including—

\* \* \* \* \* \* \*

(2) Traveling expenses (including the entire amount expended for meals and lodging) while away from home in the pursuit of a trade or business; * * *

since such expenditures would not be required by the "exigencies of the business." The Supreme Court added:

Travel expenses in pursuit of business * * * could arise only when the railroad's business forced the taxpayer to travel and to live temporarily at some place other than Mobile, * * *. Business trips are to be identified in relation to business demands and the traveler's business headquarters. * * * [326 U.S. at 474]

The principle of *Flowers* was eloquently articulated in *Steinhort* v. *Commissioner*, 335 F. 2d 496 (1964), affirming and remanding a Memorandum Opinion of this Court, to wit:

Deeply ingrained in the whole tax structure—memorialized now by literally hundreds of tax rulings, Tax and other Court decisions in such numbers as to give some factual credence to what is so often pure fiction that Congress by legislative nonaction has put its imprimatur upon a settled administrative practice[23]—is the basic proposition that the cost of going to and from home and an established place of business is a nondeductible personal expenditure. [Footnote omitted. 335 F. 2d at 503.]

We believe that the facts present in the instant case are substantively similar to those in *Flowers*. The following extract from the Supreme Court's opinion highlights the aforesaid factual similarities between the cases:

The facts demonstrate clearly that the [traveling] expenses were not incurred in the pursuit of the business of the taxpayer's employer, the railroad. Jackson was his regular home. Had his post of duty been in that city the cost of maintaining his home there and of commuting or driving to work concededly would be non-deductible living and personal expenses lacking the necessary direct relation to the prosecution of the business. The character of such expenses is unaltered by the circumstance that the taxpayer's post of duty was in Mobile, thereby increasing the costs of transportation, food and lodging. Whether he maintained one abode or two, whether he traveled three blocks or three hundred miles to work, the nature of these expenditures remained the same.

[The added costs in issue] * * * were incurred solely as the result of the taxpayer's desire to maintain a home in Jackson while working in Mobile, a factor irrelevant to the maintenance and prosecution of the railroad's legal business. * * * [326 U.S. at 473]

The Supreme Court held that Mobile was the taxpayer's principal post of business despite the fact that during the 2 taxable years in issue the taxpayer spent the greater portion of his time in Jackson.

We believe that Los Angeles was petitioner's principal post of business. It was in Los Angeles that Dodger Stadium was located. The Dodgers played approximately one-half their games at Dodger Stadium. Although the other half of their games were played in other "club towns," it was with Los Angeles that the Dodgers were and are identified. We believe that petitioner's motives for maintaining a home in Spokane were personal rather than business oriented just as the motives of the taypayer in *Flowers*, for maintaining a home in Jackson

rather than in Mobile were personal. Petitioner was paid a lump sum ($5,000) by the Dodgers for services performed in Spokane, a fraction of the sum he received for playing baseball with the Dodgers. Employment similar to that which petitioner had in Spokane would have been available to him in the Los Angeles area. Petitioner's services in Spokane were a byproduct of his association with the Dodgers.

Petitioner cites *Patricia A. Ruby Hall*, T.C. Memo. 1964-157, in support of his position. (See also *Judy L. Gooderham*, T.C. Memo. 1964-158, which was decided at the same time and which is factually and substantively similar to *Hall*.) We believe those cases are distinguishable on their facts. The taxpayers in *Hall* and *Gooderham* were both members of a union and were employed as performers by the Ice Follies, an ice-skating extravaganza. The Ice Follies was presented on a seasonal basis except for spring when there was a layoff without pay. The Ice Follies organization had its business office in Los Angeles, Calif. However, the show itself would regularly be presented in 19 to 20 cities. Its employees would travel with the show and it was understood that they would be in each city only temporarily. Each year a new edition of the Ice Follies would have its premiere in Los Angeles sometime in September. However, most of the rehearsing for the new edition of the show was done in San Francisco. Three weeks after the Los Angeles premiere, the current edition of the Ice Follies would go on tour and would not return to Los Angeles. During the spring layoffs, the taxpayer in *Hall* resided in Spokane, Wash., and the taxpayer in *Gooderham* resided in Toronto, Canada. Neither taxpayer abandoned her residence during the time she traveled with the Ice Follies. Both intended to return and did return to their respective residences when the show was not being presented. The employment contracts which each taxpayer had with the Ice Follies fixed the city of her residence as her place of employment.

In *Hall* and *Gooderham*, the Commissioner determined that the taxpayers had no "tax home," thus claiming all expenses incurred by the taxpayers while with the show were nondeductible. This court found these determinations to be erroneous. We held that the situation was similar to one where a party maintains a home at one location but accepts employment through his union for short periods of time elsewhere. In such a situation, it has been held that the taxpayer's tax home is where he maintains a residence and accepts employment.

Although the Ice Follies had its business headquarters in Los Angeles, it cannot be said that the taxpayers had their principal post of duty in Los Angeles nor that the Ice Follies was identified with Los Angeles. Here, we have found that petitioner's principal post of business was in Los Angeles, the city with which the Dodgers were associated.

In both *Hall* and *Gooderham*, this Court found that the taxpayers needed to have a home city *for business purposes* and to maintain a home to which they could return during the layoffs. Petitioner argues that under the unique facts presented herein he had to maintain a home base to which he could return each year. We agree. However, we are not aware of any business reason as to why petitioner chose to maintain his home base in Spokane rather than in Los Angeles, the Dodger club town and his principal post of duty. On the basis of the foregoing, we hold for respondent on this issue.

We must now determine whether the fair market values of the Hickok award and the MG automobile are includable in petitioner's gross income in the years such items were received by petitioner.

Section 74(b) provides, *inter alia:*

(b) EXCEPTION.—Gross income does not include amounts received as prizes and awards made primarily in recognition of religious, charitable, scientific, educational, artistic, literary, or civic achievements, * * *

### *"Hickok Belt" Award*

In 1963, petitioner received the Hickok belt, having been acclaimed as the prior year's "outstanding professional athlete." Petitioner opines that the fair market value of the Hickok belt is not includable in his taxable income. In support of this position, he argues that the award of the Hickok belt was made "primarily in recognition of religious, charitable, scientific, educational, artistic, literary, or civic achievement."

In *Paul V. Hornung*, 47 T.C. 428 (1967), the Tax Court had occasion to consider a substantively similar issue. There, the taxpayer, a professional football player of considerable renown, received an automobile in recognition of having been selected the most valuable player in a national football league championship game. The taxpayer took the position that the fair market value of the car was excludable from gross income by reason of section 74(b). He argued that his accomplishments in the championship football game constituted educational, artistic, scientific, and civic achievements within the meaning of section 74(b). In ruling against the taxpayer therein, we stated:

We believe that the words "educational," "artistic," "scientific," and "civic" as used in section 74(b) should be given their ordinary, everyday meaning in the context of defining certain types of personal achievement. * * *

 *     *     *     *     *     *     *

We feel confident that Congress had no intention of allowing professional football to constitute a type of activity for which proficiency could be recognized with an exempt award under section 74(b). * * * *Had Congress intended to except prizes or awards for recognition of athletic prowess or achievement it could readily and easily have done so; as provided now however, no such exception can be read into the statutory language used.* * * * [Emphasis supplied.]

Petitioner vainly attempts to distinguish the facts in *Hornung* from those surrounding the award of the Hickok belt in the instant case by contending that "stealing bases over a complete major league schedule is quite different from playing one football game." The mere fact that the Hickok belt was awarded for petitioner's athletic skill and prowess exhibited over an entire season does not seem to make the award any the less "athletic" in nature than had the Hickok belt been awarded for petitioner's performance in a single game. Moreover, "stealing bases" is no less exclusively an "athletic" skill than being a good halfback.

Petitioner also contends that the Hickok award was not necessarily for especial athletic skill or prowess but for his "good conduct" as a public figure involved in sports. Therefore, he asserts that the belt comes within the exclusion for awards recognizing civic achievement. In support of this position, petitioner points to his creditable record of social service and high standards of public responsibility as a highly acclaimed professional athlete. There is evidence in the record that consideration is given to factors other than athletic skills in casting a vote for a Hickok belt candidate. Nevertheless, it is clear that the award is made *primarily* in recognition of athletic skills and that excellence in sport is the predominant criterion for selection.

Petitioner argues that the Hickok belt is nontaxable on the ground that the belt is a "trophy"; that section 74 is silent on the question of a trophy; and that the belt has no fair market value because recipients intend to treat it as a "trophy." Respondent counters this argument by noting that petitioner was not subject to any restrictions as to possible disposition of the belt after receipt and that it had an actual value of over $6,000.

Petitioner's position is equitable. The receipt of an award like the Hickok belt is not equivalent to the receipt of a car or any other like item which the recipient would ordinarily find useful in his daily affairs and which he might purchase on his own. The fact that a recipient of an award having utilitarian value would commonly purchase a similar item tends to mitigate the harshness of imposing a tax upon its receipt. Clearly, the Hickok belt, being large and cumbersome, made out of gold and studded with gems, is of no utilitarian value. Its purpose is honorary and decorative. Although the Hickok belt is a valuable item, it is hardly one which the recipient would be likely to purchase in the absence of award. Thus, if taxable, the taxpayer-recipient would be required to pay for the privilege of retaining a trophy.

Despite our solicitude for petitioner's position, we do not believe that the fair market value of the Hickok belt is excludable from gross income. The law as it stands does not make exception for sentiment or

pride. Section 61(a) specifically states: "General Definition.—Except as otherwise provided in this subtitle, gross income means all income from whatever source derived." Section 74(b) provides that gross income does not include prizes-awards made primarily for achievements in various areas. As we decided above, the Hickok award was not made for achievement in one of the enumerated areas. We can see no reasonable basis for excluding a trophy from the definitional range of the terms, prizes or awards. Accordingly, we hold that the fair market value of the belt must be included in petitioner's taxable income when received.

### MG Automobile Award

Following the Dodger last home game of the 1962 baseball season, petitioner was awarded an MG automobile by a Los Angeles automobile agency. The automobile agency had programs printed which were distributed to each individual entering Dodger Stadium for a baseball game held several days prior to the award presentation. The programs contained ballots for electing the "most popular Dodger." Petitioner won this accolade.

As far as we can determine, the award of the MG automobile was made for petitioner's popularity alone. There is no indication that it was given for petitioner's religious, charitable, scientific, educational, artistic, or civic achievements. Nor can we hold that an award for popularity falls within any of the aforesaid categories, enumerated in section 74(b). Accordingly, we hold that the fair market value of the MG was includable in petitioner's taxable income.

*Decision will be entered under Rule 50.*