RONALD L. GARDIN AND CECELIA A. GARDIN, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 1903-74.    Filed September 24, 1975.

*Douglas H. Clark, Jr.,* for the petitioner.
*Richard A. Jones,* for the respondent.

TANNENWALD, *Judge:* Respondent determined a deficiency of $975 in petitioners' Federal income taxes for 1971. The sole issue presented is whether expenses paid by petitioner Ronald L. Gardin, a professional football player, for food and lodging at his employers' franchise locations were incurred while he was "away from home in the pursuit of a trade or business." [1]

### FINDINGS OF FACT

Ronald L. and Cecelia A. Gardin are husband and wife. Their 1971 joint income tax return was filed with the Western Region Service Center at Ogden, Utah.[2] At the time their petition was filed they resided in Tucson, Ariz.

From 1966 to 1969, petitioner attended the University of Arizona in Tucson. He played varsity football there during the

---

[1] Sec. 162(a). All statutory references are to the Internal Revenue Code of 1954, in effect for the year in issue.

[2] Cecelia A. Gardin is a petitioner herein only by virtue of having filed such joint return. Ronald L. Gardin is referred to as petitioner.

1968 and 1969 seasons and was considered to be one of the best players on the team.[3]

Petitioner's chances for success as a professional football player were affected by the fact that he was 25 years of age after his last year of college football, 3 or 4 years older than most players just out of college, was somewhat smaller than the average player in terms of height and weight, and had previously broken his leg. Nevertheless, in 1970 he was drafted by the Baltimore Colts professional football team. In March of that year, he signed National Football League standard player contracts with the Colts covering the 1970, 1971, and 1972 seasons. Besides the basic compensation, each contract provided that petitioner would earn bonuses on certain conditions: in his first year, if he made the final squad cut before the league season or was a starting offensive or defensive player before the final game of the season; in each year, if he led the league in kickoff returns or punt returns, or was selected to the Associated Press all-NFL or all-pro first team. Each contract also contained this clause:

If the Player fails to establish his excellent physical condition to the satisfaction of the Club physician * * *, or * * * if, in the opinion of the Head Coach, Player does not maintain himself in such excellent physical condition or fails at any time * * * to demonstrate sufficient skill and capacity to play professional football of the caliber required by the League, or by the Club, or if in the opinion of the Head Coach the Player's work or conduct in the performance of this contract is unsatisfactory as compared with the work and conduct of other members of the Club's squad of players, the Club shall have the right to terminate this contract.

With a portion of the money received on the signing of these contracts, petitioners purchased a residence in Tucson.

In June 1970, petitioner traveled to Baltimore and began training with the Colts. He made the team, and played football for the Colts through the 1970 season. That season lasted until January 1971, when the Colts won the Super Bowl championship. Petitioner dropped a punt in that game. Petitioner played almost exclusively on the "special teams" and never made the starting team.

Cecelia Gardin remained in and around Tucson throughout 1970, except for short trips to Baltimore to visit her husband. In January 1971, petitioner returned to Tucson where he resided

---

[3] He was one of two University of Arizona players drafted by National Football League teams in 1970.

until he again went to the Colts' training camp in July 1971. At that time, his wife accompanied him to Baltimore and stayed there through September of 1971. At the commencement of training for the 1971 season, he felt that his position with the team was fairly secure, though later, during training, he found that he was given less desirable assignments and that he could not play well without the use of a hearing aid installed in his helmet.

Petitioner played for the Colts until September 26, 1971, at which time he was traded to the New England Patriots. The Colts assigned the rights in his contracts to the Patriots on October 1, 1971. Petitioner traveled to the Patriots' franchise location in Needham Heights, Mass., immediately after the trade. His wife returned to Tucson where she resided for the rest of the year.

Petitioner considered the reputation of the Patriots at that time to be such that the trade jeopardized his future as a football player. Nevertheless, he entered on his new employment with enthusiasm. Shortly after his arrival, however, he had a dispute with the team's head coach which led him to ask to be traded to another team. He felt he was being treated unfairly because of the coach's personal animosity toward him. The second or third week that he played for the Patriots, petitioner dropped two punts in a game against San Francisco. The next day the Patriots placed him on injured waivers, which meant that he could not play but was still under salary and could be reactivated at any time. He remained on injured waivers throughout the remainder of the season. He attended practices, but was not asked to participate. At the end of the season, he returned to Tucson.

Before the 1972 season, petitioner was traded again, the rights in his contract being assigned to the Pittsburgh Steelers. He attended the Steelers' training camp and played one regular season game with them before he was traded to the Miami Dolphins. Petitioner stayed with the Dolphins on the reserve list for the rest of the season and was released by them in December 1972, prior to the Super Bowl game. He again returned to Tucson.

Petitioner engaged in a number of activities in Tucson when he was not playing football. He held jobs with a construction company and a department store in 1970 before attending training camp. From January to July 1971, he attended the University of Arizona part time, studying correctional administration. In

connection with his studies, he took on-the-job training at the Arizona Youth Center, a correctional institution for juveniles. He reported no income from this activity on his 1971 return.

Because of the local fame which he acquired as a star player for the University of Arizona and a member of the 1971 Super Bowl champions, petitioner was in some demand in Tucson as a promoter of athletic ventures. He was involved in the establishment of a boys' instructional sports camp during the 1971 off-season. This was conceived as a moneymaking enterprise, but was unsuccessful both in 1971 and in 1972, after which it was abandoned. At the same time, he engaged in discussions which in later years led to the formation of the Tucson Athletic Club. The club, in which petitioner became a stockholder, was to provide athletic facilities on a membership basis. Beginning in 1972, petitioner successfully solicited membership subscriptions for the club. Since his release by the Dolphins, petitioner has held various jobs in Tucson and has continued his education there.

The football teams which employed petitioner paid his living expenses only during training camp and while away from the franchise cities. The expenses here in issue, totaling $4,243, were living expenses incurred by petitioner while residing in Baltimore during August and September of 1971 and thereafter in Needham Heights until the middle of December 1971. None of the expenses were incurred by or on behalf of his wife.

At no time during the taxable years at issue did a professional football team have a franchise location in or near Tucson with which petitioner could have sought or obtained employment in his chosen career.

Petitioner earned $43,326 as a professional football player during 1971.

OPINION

The parties have agreed that the expenses claimed by petitioner are deductible under section 162(a)(2)[4] if they were incurred while he was "away from home in the pursuit of a trade

---

[4] SEC. 162. TRADE OR BUSINESS EXPENSES.

(a) IN GENERAL.—There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including—
        * * *
    (2) traveling expenses * * * while away from home in the pursuit of a trade or business;

or business." [5] The question before us is: Where was petitioner's "home" within the meaning of section 162(a)(2) during 1971?

At the outset, the possibility of petitioner pursuing his chosen career in Tucson was nil—no professional football team was located in the area. Cf. *Truman C. Tucker,* 55 T.C. 783 (1971). His other activities in Tucson during 1971 were minimal and at most constitute preparations for entering into business there at some future date. Cf. *Markey v. Commissioner,* 490 F.2d 1249 (6th Cir. 1974), revg. T.C. Memo. 1972-154; [6] *Weinstein v. United States,* 420 F.2d 700 (Ct. Cl. 1970); *Patrick L. O'Donnell,* 62 T.C. 781, 785 (1974), affd. per curiam in an unpublished order (7th Cir. 1975). It is thus apparent that Tucson cannot be considered petitioner's "home" for tax purposes during 1971.

We think it clear that, in respect of petitioner's employment with the Colts, Baltimore was his "home" for tax purposes during 1971 until his transfer to the Patriots at the end of September of that year. He had been employed by the Colts in 1970 under contracts covering 3 successive seasons. He had played for the Colts throughout the 1970 season, albeit on the "special teams" rather than as a regular player, and in the Super Bowl in January of 1971. In the summer of 1971, his employment by the Colts had 2 more years to run. He participated in the 1971 training sessions and in the early part of the regular season. We believe these specific objective facts are more significant in demonstrating a sufficient degree of permanence in his employment by the Colts than those relied upon by petitioner to show generally that his playing future was uncertain, such as his age, size, previous injuries, hearing difficulties, and playing assignments which he considered inferior or undesirable. Concededly, such latter factors imparted some aura of potential impermanence to petitioner's employment. [7] But we do not believe that there was such a "quality of impermanence" in petitioner's employment by the Colts as to support the conclusion

---

[5] Respondent has conceded that the living expenses of petitioner were ordinary and necessary.

[6] See *George Montgomery,* 64 T.C. 175, 182 (1975), on appeal (6th Cir., July 28, 1975), wherein we adopted the rationale of *Markey.*

[7] Although petitioner's contracts could be canceled by the team, we infer that they provided some degree of permanence from the facts that the right to cancel was not unqualified; that petitioner bargained for a multiyear agreement, and testified that 3 years was "the most they would give me"; and that he in fact remained employed as a football player throughout the term of his initial contracts, but was not so employed thereafter. See *Neal J. Maresca,* T.C.Memo. 1974-212.

that "he could reasonably expect his employment to terminate within a fixed or short period of time."[8] Cf. *Wills v. Commissioner*, 411 F.2d 537, 541 (9th Cir. 1969), affg. 48 T.C. 308, 310-314 (1967).

The fact that petitioner's employment with the Colts was terminated shortly after the start of the 1971 season is not enough retroactively to make his employment by the Colts for that season temporary. As a general rule, the permanent or temporary nature of employment is judged at the time it begins and is not changed by subsequent events. *Commissioner v. Peurifoy*, 254 F.2d 483, 486 (4th Cir. 1957), affd. per curiam 358 U.S. 59 (1958); *Franklin C. Dilley*, 58 T.C. 276, 281 (1972). We see nothing in the facts of this case to justify a departure from that rule. Nor does the fact that petitioner's employment by the Colts was seasonal justify the conclusion that such employment was temporary. *Wills v. Commissioner, supra. Dyer v. Bookwalter*, 230 F. Supp. 521 (W.D. Mo. 1964); *Franklin C. Dilley, supra; Truman C. Tucker, supra.*

With regard to amounts spent by petitioner in Needham Heights, the issue is less clear cut. Petitioner considered the trade to the Patriots unfavorable and, subjectively at least, this was a circumstance tending to undermine the probability that he would remain with that team for a long or indefinite period. Moreover, we recognize that, shortly *after* he joined the Patriots, certain circumstances arose which caused him to conclude that he might not remain with that team for the duration of his outstanding contract arrangements. On the other hand, petitioner clearly intended to make a go of his new position, and he was not traded to the Dolphins until after the 1971 season. Here again we are not persuaded that, on the objective facts, petitioner's employment had that degree of impermanence which would justify characterizing it as "temporary."

Petitioner's exposure to being traded during his 3-year period of employment does not compel a decision for petitioners. The potentiality of transfer does not necessarily require that an employment be characterized as "temporary." *Darrell Spear Courtney*, 32 T.C. 334, 343 (1959).[9] To hold otherwise would cause most players of professional sports to be engaged in a series

---

[8] See *Harold C. Pike*, T.C. Memo. 1971-252; *Philmon A. Clemons*, T.C. Memo. 1971-26.

[9] See also *Neal J. Maresca, supra* n. 7.

of temporary employments, so that their living expenses at franchise locations would be deductible. We do not believe that Congress intended section 162(a)(2) to produce such a result.[10]

Neither *Wright v. Hartsell,* 305 F.2d 221 (9th Cir. 1962), nor *Harvey v. Commissioner,* 283 F.2d 491 (9th Cir. 1960), revg. and remanding 32 T.C. 1368 (1959), provides a sufficient basis for sustaining petitioner's position. Even applying the somewhat modified test of determining "home" for tax purposes articulated by the Ninth Circuit Court of Appeals (to which an appeal from our decision herein would lie), we think that the facts, which we have found and analyzed, are sufficient to fit the standard of those cases that there was "a reasonable probability known to [petitioner]" that he would continue to be employed by the Colts and the Patriots during the 1971 season with the result that first Baltimore and then Needham Heights was his tax home during 1971. See *Wills v. Commissioner,* 411 F.2d at 541. In short, we are satisfied that petitioner's expenses in these two locations should be disallowed on the basis of the standard we recently reiterated in *George Montgomery,* 64 T.C. 175, 179 (1975), on appeal (6th Cir., July 28, 1975):

> This Court has consistently held that a taxpayer should be expected to make his home in the vicinity of his permanent business or employment and that only the expenses of traveling from a home so situated are deductible as a business expense under section 162(a)(2). If for personal reasons he fails to move his home to the vicinity of his permanent business or employment, his expenses of traveling from the home are incurred for personal, not business, reasons and are not deductible. * * *

Petitioner's claimed deductions for living expenses must be disallowed. Accordingly,

*Decision will be entered for the respondent.*

---

[10] On the other hand, given the particular facts of this case, we find it unnecessary to decide whether *Wills v. Commissioner,* 411 F.2d 537 (9th Cir. 1969), affg. 48 T.C. 308 (1967), stands for the proposition that the tax "home" of a professional team athlete is always at the franchise location. See Rev. Rul. 54-147, 1954-1 C.B. 51.