NATHION W. AND CARRIE E. TIDWELL, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Tidwell v. Comm'r
Docket No. 1920-71 United States Tax Court
T.C. Memo 1976-100; 1976 Tax Ct. Memo LEXIS 303; 35 T.C.M. (CCH) 427; T.C.M. (RIA) 760100; March 30, 1976, Filed Nathion W. Tidwell, pro se. [1]
Richard D. Hall, Jr., and Frederick T. Carney, for the respondent. DAWSON
MEMORANDUM FINDINGS OF FACT AND OPINION DAWSON, *304 Chief Judge: This case was assigned to and heard by Special Trial Judge Randolph F. Caldwell, Jr., pursuant to Rules 180 and 182, Tax Court Rules of Practice and Procedure. The parties have filed no exceptions of law or fact to Special Trial Judge Caldwell's report. The Court agrees with and adopts his opinion which is set forth below. OPINION OF THE SPECIAL TRIAL JUDGE CALDWELL, Special Trial Judge: This case is one of a group of 37 which were consolidated for trial, but not for opinion. At the trial evidence was received which bears upon every case in the group. Such evidence relates to certain contractual arrangements between the husband-petitioners' employers (Lockheed Air Service Company and Dynalectron Corporation) and the United States Air Force, as well as the employment arrangements between field team members (such as the husband-petitioners) and such employers. Respondent determined a deficiency in petitioners' Federal income tax for each of the years 1968 and 1969 in the respective amounts of $523.28 and $386.89. There is but a single issue for decision: whether all or any portion of the per diem payments received by petitioner Nathion Tidwell (hereinafter, *305 "petitioner") from Lockheed Air Service Company during the taxable years is includible in his gross income under section 61(a)(1) of the Internal Revenue Code of 1954; [2] and, if so, whether petitioner is entitled to deduct an amount equal to any part or all of the includible per diem payments as away-from-home traveling expenses under section 162(a)(2). Respondent's partial disallowance of petitioners' claimed medical expense deduction for 1969 was predicated solely on the determined increase in petitioners' adjusted gross income consequent on the inclusion of per diem payments in gross income. The properiety of such partial disallowance thus depends on the per/diem travel expense issue. FINDINGS OF FACT Petitioners, husband and wife, filed their 1968 and 1969 returns with the Internal Revenue Service Center at Chamblee, Georgia. They resided in or near Meridian, Mississippi, at the time they filed their petition in the present case. During 1968 and 1969, petitioner was employed as a member of field teams by Lockheed Air Service Company (hereinafter, "Lockheed") *306 and by Dynalectron Corporation (hereinafter, "Dynalectron"). Each of those corporations had a contract, during each of the years 1968 and 1969, with the United States Air Force, to provide field team services for the maintenance and modification of weapons systems (i.e., aircraft) and/or support equipment. These contracts were called "basic contracts" and the Air Force entered into such a contract with each of three different contractors. The contracts were for three years maximum duration, and those involved here were for the three fiscal years, July 1, 1967-June 30, 1968; July 1, 1968-June 30, 1969; July 1, 1969-June 30, 1970. The contract was firm for the first of the three years; but the Air Force had the unilateral right to extend the contract for the second and third years of the three-year period. The contracts were so extended by the Air Force insofar as both Lockheed and Dynalectron were concerned. (The record herein does not identify the third contractor who had the basic contract.) The basic contract did not, of itself, award any work to be performed thereunder. It did specify the wage rates which would be paid for services rendered by employees of the contractor, if *307 the contractor got work to be performed under the contract. The contract also contained the following provisions relating to the payment of per diem: (ii) Per Diem, not to exceed the applicable amounts set out below, when actually paid by the Contractor and approved by the Administrative Contracting Officer, shall be reimbursed to the Contractor, without regard to the duration of the assignment; provided, however, that no per diem shall be authorized or paid to any employee whose actual residence is within 50 miles of the work statinn to which the employee is assigned, nor shall any per diem be paid to any employee who actually resides at and commutes from his actual residence during the period of his employment, regardless of the distance between said residence and his assigned work station: (See (ii) (e) below). (a) In the CONUS (No quarters and messing facilities furnished by the Government) -- $11.00-Per day per man for Engineer and Leadman and $9.00-Per day per man for the remainder. * * * * *
(e) For the purpose of this contract the term "actual residence" is defined as the fixed or permanent domicile of an employee. The employee shall certify to the location of his fixed *308 or permanent domicile and this location, if accepted by the Contractor, shall be deemed, for the purpose of this contract, to be the employee's domicile in so far as per diem authorization against this contract is concerned. However, this does not relieve the Contractor of his responsibility to ascertain that the certification is valid. The opportunity for the contractor to perform under the basic contract arose from the issuance by the Air Force of a work order thereunder. Issuance of a work order was entirely within the discretion of the Air Force, and it alone had the discretion to select which one of the three holders of a basic contract that was to perform the work order. Performance under a work order might be at any place in the United States or at any place overseas where the Air Force maintained a base. Under the terms of the basic contract, work orders could only be issued during a given year of a basic contract. However, completion of a work order actually issued during such year might be effected after the end of the year. When the Air Force had determined to issue a work order and had notified a contractor of its selection to perform that order, representatives of *309 the Air Force and of the contractor would get together at a "pre-dock" meeting where the time for completion of the contract and the make-up of the contractor's projected field team complement would be worked out. Determination of the time of performance entailed fixing an input-output schedule -- the schedule which showed the number of units coming into the contractor for its maintenance and modification services per day or week or month, and the number of units to be completed by the contractor per day or week or month. After the projected field team complement had been worked out, the contractor would then proceed to get the team together. In assembling the team, the contractor would utilize two sources of manpower: (1) existing employees which it transferred from jobs under other work orders; and (2) new employees which it recruited. Whenever a contractor hired a new employee for field team work, that employee was advised that he was subject to being sent anywhere that the contractor might be called upon to perform a work order, and that if the employee was unwilling to travel where thus directed to go, his only alternative was to resign. The employee was also advised that *310 the contractor only had a basic contract for a year and that it had no way of knowing whether or when it would receive work orders under that contract. It was also made clear to the employee that, while the contractor would endeavor to continue to utilize the services of the employee after completion of the work order in connection with which he was hired, it could not guarantee any such further employment; and if none were available, the employee would be laid off. Neither Lockheed nor Dynalectron maintained any pool or central area where an employee who had completed an assignment could be sent pending the contractor getting another work order on which such employee could be used. Both Lockheed and Dynalectron were involved in the performance of work orders at Key Field in Meridian, Mississippi, during the years involved. [3]Lockheed had first come to Meridian in 1965 and it remained there until June 30, 1969, at which time (although it did not lose its status as holder of one of the three basic contracts) it was supplanted by Dynalectron. During the fiscal year ended June 30, 1969, Lockheed received two work orders to be performed at Meridian; and during the succeeding fiscal *311 year, Dynalectron likewise received two work orders. While in most instances, the contractor's field teams were sent to the location where the aircraft were located, in the case of the work orders performed at Meridian, the aircraft were brought by the Air Force to that work site from other locations. During the performance of a work order, the Air Force always had an on-site representative, monitoring the performance of the contractor. One of the areas of concern was to determine whether the field team was over strength or under strengh, as well as the quality of work of the field team members. Instances occurred when the composition of the field team was changed as the result of the recommendation of the Air Force's on-site representative. For this reason, as well as for the reason that the composition of the field team varied according to the nearness in point of time to the beginning or the end of the performance under the work order, the *312 projected field team complement as worked out at the pre-dock meeting might vary as much as 10 to 20 percent during the performance of the contract. When an employee was hired, or rehired, by a contractor, he was required to certify to the contractor his "permanent or domicile" address (in the case of Lockheed) or his "fixed or permanent domicile" (in the case of Dynalectron). If the address so certified was further than 50 miles from the job site where the employee was to work and if the employee did not drive back and forth to work, irrespective of the address which he had furnished, he was paid the per diem mentioned and described above. The per diem payments made by the contractors were included in their invoices to the Air Force, solely for the purpose of being reimbursed. There was no element of profit to the contractors in the per diem for which they sought reimbursement. Per diem paid to the field team employees who qualified therefor was at the rate of $11 per day for a leadman and an engineer, and $9 per day for the other members of the field teams. Per diem was paid for seven days per week, although the regular work week for field team members was a 5-day, 40-hour week. *313 Field team members also received per diem during their initial travel to a work site, for days of travel when transferred to different work sites, and for a maximum of three days for return to their homes, in the event they were laid off. They did not receive per diem during vacation periods; but they did receive per diem for three days up to a maximum of six days if they were sick. Neither Lockheed nor Dynalectron withheld Federal income tax from the per diem payments made to their employees. Petitioner first went to work for Dynalectron in 1955, and that employment lasted until 1960. Subsequently, in August 1965, petitioner was employed by Lockheed, and was assigned to Key Field at Meridian. When Dynalectron replaced Lockheed at Key Field at the end of fiscal year 1969, petitioner was rehired by Dynalectron and continued to be employed at Meridian. He was employed by Dynalectron at Key Field throughout 1970. During the period from October 8 through December 9, 1968, while the runways at Key Field were being repaired, petitioner was transferred by Lockheed to Columbus, Mississippi, a town about 82 miles north of Meridian. Petitioner advised Lockheed shortly after he was hired *314 that his "domicile town and state" was Route 3, Watertown, Tennessee; and he gave that same address to Dynalectron, when he was rehired in 1969, as his "actual residence." Petitioner had been born and raised at a rural hamlet known as Statesville, some six miles from Watertown. Both of those communities are in Wilson County, of which the county seat is Lebanon which is about 12 miles from Watertown. At the time he was hired by Lockheed, petitioner drove to Meridian alone. Thereafter, and prior to 1968, his wife and three children joined him. They lived in a mobile home owned by petitioners which was placed by them on a rented lot near Meridian. During both taxable years, all three of the children lived with petitioners. During 1968, all three children were in school at Meridian; in 1969, the two younger children attended school, but the oldest boy did not. Petitioner paid taxes to Mississippi on the mobile home. The record is not entirely certain with respect to the matter, but it appears that petitioner left his wife and children with the trailer at Meridian during the two-month period when he was assigned to Columbus. The Route 3, Watertown address furnished by petitioner to *315 his employers is a residential dwelling house at Statesville owned by petitioner's mother. Legal title thereto is in the mother's name; she and petitioner have an understanding that he has a half interest in the house. When, in 1963 or 1964, petitioners and their children moved from a house they were occupying in Lebanon, they put their furniture in the Statesville house where petitioner's mother has continued to use it. Petitioner had a Tennessee operator's permit and Tennessee license plates on his automobile during both 1968 and 1969. He and the family came to Statesville on vacations and once when his mother was hospitalized. Petitioner received $3,104 of per diem payments from Lockheed in 1968, and $1,944 from that company in 1969. He received per diem payments from Dynalectron in 1969 of $1,224. Petitioner did not include any of the Lockheed per diem payments in gross income on his return for either year. He did include $1,161 of per diem payments from Dynalectron on his 1969 return. Respondent determined that $3,104 of per diem payments were includible in gross income for 1968, and $1,944 for 1969, under section 61. He has not sought an increased deficiency for 1969. OPINION
*316 It must first be determined whether the per diem payments received by petitioner from Lockheed in 1968 and 1969 are includible in his gross income for those years. The Dynalectron per diem is not in issue. Petitioner included $1,161 of the $1,224 of such payments which he received in 1969 on his return for that year; and respondent has not sought to amend his answer so as to include the $63 not reported. It is believed that the Lockheed per diem payments constituted gross income to petitioner when received by him. In very broad language, section 61(a)(1) provides that "gross income means all income from whatever source derived." The Supreme Court has construed this "broad phraseology" to evince a Congressional intention "to tax all gains except those specifically exempted." Commissioner v. Glenshaw Glass Co.,348 U.S. 426, 430. The per diem payments were "undeniable accessions to wealth, clearly realized and over which the [petitioner had] complete dominion," ( Commissioner v. Glenshaw Glass Co.,supra, p. 431); and the Code contains no provision exempting per diem payments from taxation. Manifestly, then, the respondent was correct in including *317 in petitioner's 1968 and 1969 gross income the Lockheed per diem payments he received in those years. It is to be noted that petitioner himself included in gross income the Dynalectron per diem payments which he received in that year. Leo C. Cockrell,38 T.C. 470, 477-478, affd. (C.A. 8) 321 F.2d 504; Darrell Spear Courtney,32 T.C. 334, 341. [4]
The question remains whether petitioner is entitled to deduct under section 162(a)(2) amounts equal to any part or all of the Lockheed per diem payments, as expenses of travel while away from home in pursuit of his trade or business as an employee of Lockheed, Leo C. Cockrell,supra, p. 479. In the Cockrell case, it was pointed out that the Supreme Court, in Commissioner v. Flowers,326 U.S. 465, rehearing denied 326 U.S. 812, had laid down three requirements that a taxpayer must meet to be entitled to deduct away-from-home expenses: The expenses must be (1) reasonable and necessary traveling expenses, (2) incurred by the taxpayer while away from home, and (3) incurred *318 in pursuit of business. In the present case, the parties differ only on the point of whether petitioner was away from home. In the case of Truman C. Tucker,55 T.C. 783, 786, the factors to be considered in determining whether a taxpayer should be treated as away from home for tax purposes were crystallized. It was there said: The purpose of allowing the deduction of living expenses while a taxpayer is "away from home" is "to mitigate the burden of the taxpayer who, because of the exigencies of his trade or business, must maintain two places of abode and thereby incur additional and duplicate living expenses." Ronald D. Kroll,49 T.C. 557, 562 (1968). In furtherance of this purpose, when a taxpayer with a principal place of employment goes elsewhere to take work which is merely temporary, he may deduct the living expenses incurred at the temporary post of duty, because it would not be reasonable to expect him to move his residence under such circumstances. Emil J. Michaels,53 T.C. 269 (1969); Ronald D. Kroll,supra.For this purpose, temporary employment is the type which can be expected to last for only a short period *319 of time. Beatrice H. Albert,13 T.C. 129, 131 (1949). On the other hand, if a taxpayer chooses for personal reasons to maintain a family residence far from his principal place of employment, then his additional traveling and living expenses are incurred as a result of that personal choice, and are therefore not deductible. Commissioner v. Flowers,supra;Ronald D. Kroll,supra at 561-562; Floyd Garlock,34 T.C. 611, 614 (1960); Mort L. Bixler,5 B.T.A. 1181, 1184 (1927). Similarly, if a taxpayer accepts indefinite employment outside the vicinity in which he lives, but he does not change his family residence, the travel to his new place of employment and the additional living costs which he incurs there result, not from his employment, but from his decision not to move his residence. Rendell Owens,50 T.C. 577 (1968); Maurice M. Wills,48 T.C. 308 (1967), affd. 411 F.2d 537 (C.A. 9, 1969). Thus, the deductibility of traveling expenses and duplicate living expenses depends upon the ultimate question of whether the taxpayer, under all the circumstances, *320 could reasonably have been expected to move his residence to the vicinity of his employment. Two points are thus presented: Were petitioner's assignments in 1968 and 1969 temporary, as opposed to indefinite? And, did he maintain two places of abode and thereby incur additional and duplicate living expenses. Bearing in mind that petitioner first arrived at Meridian in August 1965 and (with the exception of the two-month period in 1968 when he was assigned to Columbus) that he remained there at least through 1970, [5] it is believed that petitioner's assignment at Key Field in Meridian was indefinite during 1968 and 1969. The Key Field assignment could probably have been regarded as temporary at its inception and for perhaps a year or so thereafter; but when it persisted and went on and on, it has to be regarded as having been transformed into an indefinite one. However, the two-month interlude when petitioner was transferred up to Columbus while the Key Field runways were being repaired was a temporary assignment. Coming to the second point, *321 whether petitioner maintained two places of abode and thereby incurred additional and duplicate living expenses, the evidence is persuasive that he did not do so while he was working at Key Field, but that he did do so when he was at Columbus. Petitioner and his family worked, ate, slept, went to school -- in short made their home -- at Meridian while petitioner was working there. It was there, and not in Tennessee or any place else, that petitioner incurred those living expenses that all must bear. He incurred no additional or duplicate living expenses. Meridian must be regarded as his tax home. He should not be allowed a deduction in respect of any of the amounts of per diem he received while working at Meridian in 1968 or 1969. However, during the time petitioner was working at the temporary assignment in Columbus while his family remained in Meridian, it is believed that he did maintain two places of abode and incur duplicate and additional living expenses. He should be allowed a deduction for 1968 in an amount equal to the per diem he received while at Columbus. That amount was $558 (62 days at $9 per day). * * * * *
In accordance with the foregoing, Decision will be *322 entered under Rule 155.
Footnotes
1. DeQuincy V. Sutton was counsel of record for petitioners at the time of trial. Mr. Sutton died in August 1974, shortly after the last brief was filed. There is presently no counsel of record for petitioners.↩
2. All section references are to the Internal Revenue Code of 1954, unless otherwise specified.↩
3. The petitioner-husband in the present case, as well as all the other husband-petitioners, worked at Key Field in Meridian. It is this work at Meridian that is the common element that prompted the consolidation of the cases for trial.↩
4. See also Fred W. Phillips,T.C. Memo. 1973-58↩.
5. It may even be that petitioner was still at Key Field at the time of trial in July 1972. The record is not certain on this point.↩