KENNETH W. AND MARGARET H. ROSS, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Ross v. Commissioner
Docket No. 2674-71.
United States Tax Court
T.C. Memo 1976-128; 1976 Tax Ct. Memo LEXIS 278; 35 T.C.M. (CCH) 573; T.C.M. (RIA) 760128; April 22, 1976, Filed Kenneth W. Ross, pro se. [1]
*279 Richard D. Hall, Jr., and Frederick T. Carney, for the respondent. DAWSON
MEMORANDUM FINDINGS OF FACT AND OPINION DAWSON, Chief Judge: This case was assigned to and heard by Special Trial Judge Randolph F. Caldwell, Jr., pursuant to Rules 180 and 182, Tax Court Rules of Practice and Procedure. The parties have filed no exceptions of law or fact to Special Trial Judge Caldwell's report. The Court agrees with and adopts his opinion which is set forth below. OPINION OF SPECIAL TRIAL JUDGE CALDWELL, Special Trial Judge: This case was one of a group of 37 which were consolidated for trial, but not for opinion. At the trial, evidence was received which bears upon every case in the group. Such evidence relates to certain contractual arrangements between the husband-petitioners' employers, Lockheed Air Service Company (hereinafter, "Lockheed") and Dynalectron Corporation (hereinafter, "Dynalectron"), and the United States Air Force, as well as the employment arrangements between field team members (such as the husband-petitioners) and such employers. Respondent determined a deficiency in petitioners' Federal income taxes for each of the years 1968 *280 and 1969, in the respective amounts of $440.01 and $578.66. The only issue presented for decision is whether all or any portion of the per diem payments which petitioner Kenneth Ross (hereinafter, "petitioner") received from Lockheed and Dynalectron during the taxable years is includible in his gross income under section 61(a)(1) of the Internal Revenue Code of 1954; [2] and, if so, whether petitioner is entitled to deductions for amounts equal to the per diem payments included in his income for each year, as away-from-home traveling expenses under section 162(a)(2). FINDINGS OF FACT Petitioners, husband and wife, filed their 1968 and 1969 returns with the Internal Revenue Service Center at Chamblee, Georgia. The evidence of record does not establish their residence at the time they filed their petition in the instant case. During 1968 and for a portion of the year 1969, petitioner was employed as a field team member by Lockheed; and for the remainder of 1969, he was so employed by Dynalectron. Each of those corporations had a contract with the United *281 States Air Force to provide field team services for the maintenance and modification of weapons systems (i.e., aircraft) and/or support systems. These contracts were called "basic contracts" and the Air Force entered into such a contract with each of three different contractors. The contracts were for three years maximum duration, and those involved here were for the three fiscal years, July 1, 19677-June 30, 1968; July 1, 1968-June 30, 1969; July 1, 1969-June 30, 1970. The contract was firm for the first of the three years; but the Air Force had the unilateral right to extend the contract for the second and third years of the three-year period. The contracts were so extended by the Air Force insofar as both Lockheed and Dynalectron were concerned. (The record herein does not identify the third contractor who had the basic contract.) The basic contract did not, of itself, award any work to be performed thereunder. It did specify the wage rates which would be paid for services rendered by employees of the contractor, if the contractor got work to be performed under the contract. The contract also contained the following provisions relating to the payment of per diem: (ii) *282 Per Diem, not to exceed the applicable amounts set out below, when actually paid by the Contractor and approved by the Administrative Contracting Officer, shall be reimbursed to the Contractor, without regard to the duration of the assignment; provided, however, that no per diem shall be authorized or paid to any employee whose actual residence is within 50 miles of the work station to which the employee is assigned, nor shall any per diem be paid to any employee who actually resides at and commutes from his actual residence during the period of his employment, regardless of the distance between said residence and his assigned work station: (See (ii)(e) below). (a) In the CONUS (No quarters and messing facilities furnished by the Government) -- $11.00-Per day per man for Engineer and Leadman and $9.00-Per day per man for the remainder. * * * * *
(e) For the purpose of this contract the term "actual residence" is defined as the fixed or permanent domicile of an employee. The employee shall certify to the location of his fixed or permanent domicile and this location, if accepted by the Contractor, shall be deemed, for the purpose of this contract, to be the employee's domicile *283 in so far as per diem authorization against this contract is concerned. However, this does not relieve the Contractor of his responsibility to ascertain that the certification is valid. The opportunity for the contractor to perform under the basic contract arose from the issuance by the Air Force of a work order thereunder. Issuance of a work order was entirely within the discretion of the Air Force, and it alone had the discretion to select which one of the three holders of a basic contract that was to perform the work order. Performance under a work order might be at any place in the United States or at any place overseas where the Air Force maintained a base. Under the terms of the basic contract, work orders could only be issued during a given year of a basic contract. However, completion of a work order actually issued during such year might be effected after the end of the year. When the Air Force had determined to issue a work order and had notified a contractor of its selection to perform that order, representatives of the Air Force and of the contractor would get together at a "pre-dock" meeting where the time for completion of the contract and the make-up of the *284 contractor's projected field team complement would be worked out. Determination of the time of performance entailed fixing an input-output schedule -- the schedule which showed the number of units coming into the contractor for its maintenance and modification services per day or week or month, and the number of units to be completed by the contractor per day or week or month. After the projected field team complement had been worked out, the contractor would then proceed to get the team together. In assembling the team, the contractor would utilize two sources of manpower: (1) existing employees which it transferred from jobs under other work orders; and (2) new employees which it recruited. Whenever a contractor hired a new employee for field team work, that employee was advised that he was subject to being sent anywhere that the contractor might be called upon to perform a work order, and that if the employee was unwilling to travel where thus directed to go, his only alternative was to resign. The employee was also advised that the contractor only had a basic contract for a year and that it had no way of knowing whether or when it would receive work orders under that contract. *285 It was also made clear to the employee that, while the contractor would endeavor to continue to utilize the services of the employee after completion of the work order in connection with which he was hired, it could not guarantee any such further employment; and if none were available, the employee would be laid off. Neither Lockheed nor Dynalectron maintained any pool or central area where an employee who had completed an assignment could be sent pending the contractor getting another work order on which such employee could be used. Both Lockheed and Dynalectron were involved in the performance of work orders at Key Field in Meridian, Mississippi, during the years involved. [3]Lockheed had first come to Meridian in 1965 and it remained there until June 30, 1969, at which time (although it did not lose its status as holder of one of the three basic contracts) it was supplanted by Dynalectron. During the fiscal year ended June 30, 1969, Lockheed received two work orders to be performed at Meridian; and during the succeeding fiscal year, Dynalectron likewise received two work orders. While in most instances, the contractor's field teams were sent to the location where the aircraft *286 were located, in the case of the work orders performed at Meridian, the aircraft were brought by the Air Force to that work site from other locations. During the performance of a work order, the Air Force always had an on-site representative, monitoring the performance of the contractor. One of the areas of concern was to determine whether the field team was over strength or under strength, as well as the quality of work of the field team members. Instances occurred when the composition of the field team was changed as the result of the recommendation of the Air Force's on-site representative. For this reason, as well as for the reason that the composition of the field team varied according to the nearness in point of time to the beginning or the end of the performance under the work order, the projected field team complement as worked out at the pre-dock meeting might vary as much as 10 to 20 percent during the performance of the contract. *287 When an employee was hired, or rehired, by a contractor, he was required to certify to the contractor his "permanent or domicile" address (in the case of Lockheed) or his "fixed or permanent domicile" (in the case of Dynalectron). If the address so certified was further than 50 miles from the job site where the employee was to work and if the employee did not drive back and forth to work, irrespective of the address which he had furnished, he was paid the per diem mentioned and described above. The per diem payments made by the contractors were included in their invoices to the Air Force, solely for the purpose of being reimbursed. There was no element of profit to the contractors in the per diem for which they sought reimbursement. Per diem paid to the field team employees who qualified therefor was at the rate of $11 per day for a leadman and an engineer, and $9 per day for the other members of the field teams. Per diem was paid for seven days per week, although the regular work week for field team members was a 5-day, 40-hour week. Field team members also received per diem during their initial travel to a work site, for days of travel when transferred to different work *288 sites, and for a maximum of three days for return to their homes, in the event they were laid off. They did not receive per diem during vacation periods; but they did receive per diem for three days up to a maximum of six days if they were sick. Neither Lockheed nor Dynalectron withheld Federal income tax from the per diem payments made to their employees. Petitioner, an aircraft electrician, was first hired by Lockheed in 1965 and was sent to Biloxi, Mississippi, as a field team member, where he worked for two months. At that time, he was terminated by Lockheed, and he returned to Selma, Alabama, which was his home at the time he had been hired by Lockheed. After working at a factory in Selma for two or three weeks, petitioner was rehired by Lockheed in 1965 and assigned as a field team member at Key Field in Meridian. The record does not reveal petitioner's whereabouts from the time of his rehiring by Lockheed until July 21, 1967. On the latter date he was assigned to Key Field again and remained there in Lockheed's employment (with the exception of a 63-day period, described below) until that company was supplanted by Dynalectron at the end of fiscal 1969. Petitioner *289 was then hired by Dynalectron and remained at Key Field until he was terminated in August 1971. During the 63-day period, just mentioned, while the runways at Key Field were being repaired, petitioner was transferred to Columbus, Mississippi, a town about 82 miles north of Meridian. Petitioner advised Lockheed that his "permanent or domicile address" was a house in Selma, Alabama, which was the home of his parents, and he likewise gave the address of his parents' home to Dynalectron as his "actual residence" when hired by that company in 1969. Petitioner had been born and raised in Selma, and lived there until 1965 when he was hired by Lockheed. Desiring to keep his family together, petitioner has always taken his wife and children with him since entering Lockheed's employment.While assigned to Key Field, petitioner and his family lived in various rental properties in Meridian. During the 63-day assignment to Columbus, petitioner went alone to that locality, and sent his wife and children back to Selma. Petitioner owns no real property in Selma, and the only personal property he had there after leaving in 1965 were some odds and ends left at his parents' house which he could *290 not carry with him. Petitioner kept Alabama license plates on his car and also had an Alabama driver's permit during the taxable years. He was registered with a Selective Service Board in Selma, and had Alabama income tax withheld from his pay by Lockheed. Since being rehired by Lockheed, he has not lived or worked in Selma. Petitioner received $3,104 of per diem payments from Lockheed in 1968, and $1,944 from that company in 1969. He received per diem payments from Dynalectron in 1969 of $1,224. Petitioner did not include any of the foregoing per diem payments in gross income on his return for either year. Respondent determined that $2,537 of the per diem payments received in 1968 were includible in gross income for that year, and $3,105 of per diem payments received in 1969 were likewise includible, under section 61. Respondent has not sought to amend his answer to claim an increased deficiency for either year. OPINION It must first be determined whether the per diem payments received by petitioner from Lockheed in 1968 and 1969, and from Dynalectron in 1969 are includible in his gross income for those years. It is to be noted that the respondent's determination for *291 1968 did not include the per diem payments received by petitioner in respect of the Columbus assignment in petitioner's gross income for that year. The $567 difference between the $3,104 which petitioner received and the $2,537 which respondent included is exactly equal to per diem at $9 per day for the 63 days of that assignment. It is believed that the per diem payments, in the amounts determined by respondent, constituted gross income to petitioner when received by him. In very broad language, section 61(a)(1) provides that "gross income means all income from whatever source derived." The Supreme Court has construed this "broad phraseology" to evince a Congressional intention "to tax all gains except those specifically exempted." Commissioner v. Glenshaw Glass Co.,348 U.S. 426, 430. The per diem payments were "undeniable accessions to wealth, clearly realized and over which the [petitioner had] complete dominion," ( Commissioner v. Glenshaw Glass Co.,supra, p. 431); and the Code contains no provision exempting per diem payments from taxation. Manifestly, then, respondent was correct in including in petitioner's 1968 and 1969 gross *292 income the per diem payments as determined by him. Leo C. Cockrell,38 T.C. 470, 477-478, affd. (C.A. 8) 321 F.2d 504; Darrell Spear Courtney,32 T.C. 334, 341. [4]
The question remains whether petitioner is entitled to deduct under section 162(a)(2) amounts equal to any part or all of the includible Meridian-related per diem payments, as expenses of travel while away from home in pursuit of his trade or business as an employee of Lockheed and Dynalectron, Leo C. Cockrell,supra, p. 479. In the Cockrell case, it was pointed out that the Supreme Court, in Commissioner v. Flowers,326 U.S. 465, rehearing denied 326 U.S. 812, had laid down three requirements that a taxpayer must meet to be entitled to deduct away-from-home expenses: The expenses must be (1) reasonable and necessary traveling expenses, (2) incurred by the taxpayer while away from home, and (3) incurred in pursuit of business. In the present case, the parties differ only on the point of whether petitioner was away from home. In the case of Truman C. Tucker,55 T.C. 783, 786, *293 the factors to be considered in determining whether a taxpayer should be treated as away from home for tax purposes were crystallized. It was there said: The purpose of allowing the deduction of living expenses while a taxpayer is "away from home" is "to mitigate the burden of the taxpayer who, because of the exigencies of his trade or business, must maintain two places of abode and thereby incur additional and duplicate living expenses." Ronald D. Kroll,49 T.C. 557, 562 (1968). In furtherance of this purpose, when a taxpayer with a principal place of employment goes elsewhere to take work which is merely temporary, he may deduct the living expenses incurred at the temporary post of duty, because it would not be reasonable to expect him to move his residence under such circumstances. Emil J. Michaels,53 T.C. 269 (1969); Ronald D. Kroll,supra.For this purpose, temporary employment is the type which can be expected to last for only a short period of time. ( Beatrice H. Albert,13 T.C. 129, 131 (1949). On the other hand, if a taxpayer chooses for personal reasons to maintain a family residence far from *294 his principal place of employment, then his additional traveling and living expenses are incurred as a result of that personal choice, and are therefore not deductible. Commissioner v. Flowers,supra; Ronald D. Kroll,supra at 561-562; Floyd Garlock,34 T.C. 611, 614 (1960); Mort L. Bixler,5 B.T.A. 1181, 1184 (1927). Similarly, if a taxpayer accepts indefinite employment outside the vicinity in which he lives, but he does not change his family residence, the travel to his new place of employment and the additional living costs which he incurs there result, not from his employment, but from his decision not to move his residence. Rendell Owens,50 T.C. 477 (1968); Maurice M. Wills,48 T.C. 308 (1967), affd. 411 F.2d 537 (C.A. 9, 1969). Thus, the deductibility of traveling expenses and duplicate living expenses depends upon the ultimate question of whether the taxpayer, under all the circumstances, could reasonably have been expected to move his residence to the vicinity of his employment. Two points are thus presented: Were petitioner's 1968 and 1969 *295 assignments at Meridian temporary, as opposed to indefinite? And, did he maintain two places of abode and thereby incur additional and duplicate living expenses. It is not necessary to decide whether the Meridian assignments were temporary or whether they were indefinite, although the prolonged duration thereof points to indefinite, for it is abundantly clear that petitioner, while stationed at Meridian, did not maintain two places of abode and thereby incur additional and duplicate living expenses. Petitioner had his wife and children with him all during the Meridian assignments, and it was there, and there only, that they incurred their family living expenses. Meridian, and not Selma, was where they ate, slept, worked -- in short, made their home.The single set of living expenses which they incurred at Meridian thus constituted nothing more than those personal, living, or family expenses which are barred deduction by section 262. Petitioner's contention that Selma was his home, for purposes of section 162(a)(2), is without merit. He had only slight connections with that community during the taxable years and certainly it was not his tax home in 1968 and 1969. The evidence indicates *296 that while it was such up to 1965, it ceased to be that at or shortly after he was rehired by Lockheed in that year, for petitioner has not lived or worked there since that time. Petitioner should not be entitled to a deduction for away-from-home traveling expenses under section 162(a)(2) for either year, and respondent's determination should be sustained. * * * * *
In accordance with the foregoing, Decision will be entered for respondent. Footnotes
1. DeQuincy V. Sutton was counsel of record for petitioners at the time of trial. Mr. Sutton died in August 1974, shortly after the last brief was filed. There is presently no counsel of record for petitioners.↩
2. All section references are to the Internal Revenue Code of 1954, unless otherwise specified.↩
3. The petitioner-husband in the present case, as well as all the other husband-petitioners, worked at Key Field in Meridian. It is this work at Meridian that is the common element that prompted the consolidation of the cases for trial.↩
4. See also Fred W. Phillips,T.C. Memo. 1973-58↩.