WILLIAM H. HORTON AND SHARON A. HORTON, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 24556-82.          Filed April 3, 1986.

*C. Frederick Bent III*, for the petitioner. *
*Paul J. Dee*, for the respondent.

WHITAKER, *Judge*: For petitioners' 1978 calendar year, respondent determined a deficiency in the amount of $2,275 and additions to tax under section 6651(a)[1] of $289.21 and under section 6653(a) of $119.30. After concessions, the issues are whether or not petitioner William A. Horton (Horton) is entitled to deductions for travel between Michigan and California, for living and travel expenses while in California where he played hockey for professional minor league hockey teams, for certain conditioning expenses, and

---

*Although the briefs on behalf of petitioner were signed by Mr. Horton, pro se, Mr. Bent has not withdrawn his appearance.

[1] All section references are to the Internal Revenue Code of 1954 as amended and in effect during the year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

whether the additions to tax are to be sustained. During all of the year 1978, petitioners were husband and wife.

### FINDINGS OF FACT

Some of the facts have been stipulated and are so found, except as clarified herein. The petition was filed on October 8, 1982. The parties have stipulated that, at the time the petition was filed, petitioners resided in Flint, Michigan. However, based upon the evidence, we find that Horton and Mrs. Horton were divorced in 1980, that he moved from Michigan to New York State in 1981, where he resided on the date the petition was filed, and that Mrs. Horton died in Canada in 1982. Her date of death is not contained in this record. Both Horton and Mrs. Horton were citizens of Canada and permanent residents in the United States. There was no administration of Mrs. Horton's estate and apparently she died without assets. No representative of Mrs. Horton's estate was served with notice of trial. In the interest of judicial economy, and since Mrs. Horton's date of death is not set forth in the record, we will dismiss the petition against Mrs. Horton. Notwithstanding the language used in the stipulation and other documents, the parties to this proceeding will be petitioner William H. Horton and respondent.

At the time of trial, Horton's principal occupation had been as a player of professional hockey since approximately 1967 or 1968. From 1969 to 1972 he played with a team in Flint, Michigan. He purchased a home there in 1970 which he maintained as his residence until sale of the house in 1978, when the Hortons moved to an apartment complex in Flint. The parties have stipulated that during the entire 1978 taxable year, both Hortons were legally domiciled in the State of Michigan.

The Hortons were married sometime prior to the year 1975. From that year until her death in 1982 (or shortly before that), Mrs. Horton had a permanent full-time job with a telephone company in Flint, Michigan, except for about 6 months in 1975 and 1976. For the year 1978, the Hortons together reported gross wages of $14,599. Mrs. Horton earned $7,457, or 51 percent, of the gross income. The balance was earned by Horton from two different minor

league hockey teams and from sales commissions from a Buick agency.

In 1978, and presumably prior and subsequent to that time, the regular hockey season consisted of 80 games covering a period of approximately 6 months, running from September or later in the fall through approximately March in the following spring. Thus, the year 1978 covered the second half of the 1977-78 hockey season and the first half of the 1978-79 hockey season.

When Horton first commenced playing professional hockey in 1967 or 1968, he joined a team in Dayton, Ohio. That team was in the International Hockey League. We do not know whether that was a minor or major league. Then he played with a Flint, Michigan, team for 3 years until 1972. He then joined the Cleveland Crusaders, a member of the World Hockey Association, apparently for the 1972-73 season, maintaining his Flint residence. He was then traded to the Los Angeles Sharks and played in Los Angeles for approximately 6 months. This team went out of existence and from there Horton became a free agent playing in the minor leagues until he was picked by the Indianapolis Racers, a major league organization, in 1974. He spent a month during 1974 with a farm club of the Indianapolis Racers, then played with that team for approximately 3 months (presumably the last half of the 1974-75 season.) He was then sent by the Indianapolis club to play in Sweden for the following fiscal year, 1975-76. Mrs. Horton accompanied Horton to Sweden for this temporary assignment. During that period of time his salary was paid by the Indianapolis Racers. On his return from Sweden, being still under contract with the Indianapolis Racers, he was sent to the minor leagues in Utica, New York, where he apparently remained through the 1976-77 season, when his contract with the Racers apparently expired.[2] During each of these years, in between seasons, Horton returned to his residence in Michigan. In 1977, or perhaps before that, Horton obtained a Michigan real estate salesman's license and

---

[2]Unfortunately, the record is not too clear on the various contract provisions or on the exact dates when Horton switched from one team to another. However, his contract with the Indianapolis Racers was for substantially more than 1 year, whereas his contracts with the minor league teams starting in the fall of 1977 were apparently for no longer than the 6-month season.

worked in the real estate business during the summers. His salary with major league teams was in the neighborhood of $35,000, whereas the minor league salaries averaged closer to $12,000, and in the year 1978, as pointed out, Horton's earnings from playing hockey were slightly less than $5,500.

During the early part of 1977, Horton became interested in the newly formed Pacific Hockey League which was offering to pay more money than was customary in the minor leagues. He entered into a 6-month contract with the San Diego Hawks for the 1977-78 season. After working as a real estate agent in Flint, Michigan, during the summer of 1977, he drove from Michigan to San Diego, California, and arranged living quarters in a rented apartment with two other men. Mrs. Horton remained in Michigan, continuing her full-time employment. Toward the end of December, Horton was traded to the Long Beach Sharks and his contract was assigned to that club by the San Diego Hawks. He finished the 1977-78 season with the Sharks, sold his automobile in California, and flew back to Michigan where he resumed his activities as a real estate agent.

Horton contracted with the San Diego Mariners to play for them during the 1978-79 season as a fall-back position. During the summer of 1978, Horton went to the Eastern Hockey League on an unsuccessful job hunt. He also tried in 1978 unsuccessfully to join a Flint, Michigan, hockey team. Before leaving for California in the fall of 1978, Horton placed his real estate license in escrow, which minimized the cost of maintaining the license. Having purchased a car in Michigan, he rented a trailer and arrived in San Diego before the commencement of the season to work for a Buick dealership selling automobiles. He continued this work at least part time during the hockey season. Horton played for the Mariners until around Christmas 1978 when he was traded back to the Long Beach Sharks with which team he concluded the 1978-79 season. Returning again to his residence in Flint, Michigan, he resumed the real estate business, making several thousand dollars in commissions.[3]

---

[3] Apparently, Horton continued to play hockey during the succeeding seasons until he moved into coaching, although this is not entirely clear from the record. In any event, Horton did not return to California in the fall of 1979 or thereafter.

## OPINION

Before focusing on the specific deductions claimed, it is necessary to determine for the year 1978 the location of Horton's tax home. Horton contends that his tax home (and presumably the tax home of Mrs. Horton) prior to 1978 was in Flint, Michigan, and remained there throughout the year 1978. Respondent, on the other hand, argues that Horton's tax home was in California during the taxable year 1978[4] and, therefore, that the expenses in question are nondeductible personal expenses under section 262. Section 162(a)(2) allows a taxpayer a deduction for "traveling expenses (including amounts expended for meals and lodging ) while away from home in the pursuit of a trade or business." In order to come within this Code section, the taxpayer must establish that these expenses were: (1) Reasonable and necessary; (2) incurred while "away from home"; and (3) incurred in pursuit of a trade or business. *Commissioner v. Flowers*, 326 U.S. 465, 470 (1946); *Foote v. Commissioner*, 67 T.C. 1, 3 (1976).

This Court has held that a taxpayer's "home" for the purposes of section 162(a)(2) is in the vicinity of his principal place of business whenever his personal residence is not located in the same vicinity. *Mitchell v. Commissioner*, 74 T.C. 578, 581 (1980); *Kroll v. Commissioner*, 49 T.C. 557 (1968). There is, however, an exception to this rule when a taxpayer with a well-established tax home accepts temporary employment as opposed to indefinite employment elsewhere. In this context, temporary employment means the sort of employment in which termination within a short period of time could be logically expected and foreseen. *Groover v. Commissioner*, 714 F.2d 1103 (11th Cir. 1983), affg. per curiam a Memorandum Opinion of this Court; *Albert v. Commissioner*, 13 T.C. 129, 131 (1949). See also *McCallister v. Commissioner*, 70 T.C. 505, 509 (1978). On the other hand, whenever termination of employment cannot be expected or foreseen within a fixed or reasonably short period of time, the taxpayer's tax home shifts to such place of employment so that he cannot satisfy the "away from

[4]Neither party has considered or argued the impact on this case, deemed by us to be significant, of the effect on the tax home of the married couple, of Mrs. Horton's full-time job, and her status as the principal breadwinner.

home" requirement, *Verner v. Commissioner*, 39 T.C. 749 (1963).

As respondent argues, the "tax home" of an individual engaged in professional sports has been defined as his principal place of business or employment which generally is held to be the home office of the team by which he is employed. Thus, for example, in *Gardin v. Commissioner*, 64 T.C. 1079 (1975), we held that the taxpayer's tax home was in Baltimore, Maryland, the home base of the Baltimore Colts. In that case, the taxpayer's employment was expected to last for at least 3 years (under three successive 1-year contracts). His tax home was in Baltimore for the year 1970 and until September of 1971 when he was transferred by the Colts to the Patriots whose home base was in Needham Heights, Massachusetts. With respect to the balance of the year 1971, we held that this professional football player's tax home changed to Massachusetts, although our decision on that issue was "less than clear cut." In *Gardin*, we relied on *Wills v. Commissioner*, 411 F.2d 537 (9th Cir. 1969), affg. 48 T.C. 308 (1967), in which we reached a similar conclusion with respect to a professional baseball player employed by the Los Angeles Dodgers. We also relied on our opinion in *Montgomery v. Commissioner*, 64 T.C. 175, 179 (1975), affd. 532 F.2d 1088 (6th Cir. 1976), which involved our determination that the tax home of a State legislator was at the State capital. In *Montgomery*, we reiterated the proposition that "a taxpayer should be expected to make his home in the vicinity of his *permanent* business or employment." (Emphasis supplied.) See also *Stemkowski v. Commissioner*, 76 T.C. 252 (1981), revd. on another issue 690 F.2d 40 (2d Cir. 1982); *Blue v. Commissioner*, T.C. Memo. 1982-486. It is to be noted that in each of these opinions we found that the taxpayer's employment with the professional team was permanent or indefinite as contrasted with temporary.

In the instant case, however, the last permanent or indefinite employment which Horton had prior to the year in issue was with the Indianapolis Racers. That terminated in the spring of 1977. Horton's next employment with the

San Diego Hawks was for the 1977-78 season. It was employment which was scheduled to terminate within 6 months, which is a short period of time. His actual playing for the Hawks lasted only for one-half of the season and there was no reason to believe at that time that the 6-month term would be extended either by the Long Beach Sharks or the Hawks.

In this case, applying subjective criteria as we are called upon to do,[5] Horton's employment during 1978 was temporary, not indefinite. His contracts for the two hockey seasons were each limited to 6 months. His actions were consistent with his treatment of the employment as temporary, and the fact that he was traded from team to team during the two seasons confirms that there could be no reasonable expectation of anything other than temporary employment. This employment was temporary by any standard.

Upon returning to his permanent domicile in Flint, Michigan, in the spring of 1977, with his hockey team employment terminated, Horton's tax home reverted to his Michigan domicile, on the assumption, which on this record is far from clear, that it had not reverted to Flint, Michigan, prior to or at the time of his assignment to the temporary job in Sweden in the prior year. Respondent makes much of the fact that Horton did not undertake to find a job for his wife in San Diego either in 1977 or again in 1978. Respondent fails to take into account, however, that during the summer of 1977, Horton was without permanent or indefinite employment. His wife was at that point the main source of income for the family. Throughout the year in issue, she continued to earn more than half of the family's gross income. It is not reasonable to have expected the Hortons to move their residence and domicile to San Diego for 6 months of temporary employment, which would have required Mrs. Horton to leave a better paying permanent job. This circumstance continued throughout the year 1978. Accordingly, we hold that Horton's employment throughout the year 1978 with the several minor league teams was temporary. His tax home was and re-

---

[5] See *Groover v. Commissioner*, 714 F.2d 1103 (11th Cir. 1983), affg. a Memorandum Opinion of this Court.

mained in Flint, Michigan, the situs of the family's only permanent employment. The probability that marital difficulties were beginning to surface during 1978 is understandable as well as immaterial.

In this context, we now analyze the particular expenditures. On their 1978 income tax return, Horton claimed employee business expenses in the amount of $10,785. In the stipulation, Horton increased that total to $11,734, the entire increase being attributable to the item of hotel and lodging expenses in California. The following table shows the items and amounts:

| Item | Amount |
|---|---|
| Contract negotiation fees and costs | $889 |
| Temporary hotel and lodging - California | 6,507 |
| Business telephone | 543 |
| Conditioning equipment and costs | 346 |
| U-Haul costs | 312 |
| Business cards | 45 |
| Professional publications | 35 |
| Sales license | 30 |
| Sports tickets | 28 |
| Miscellaneous fees | 20 |
| Automobile expense | 2,979 |
| Total | 11,734 |

Two of these items are not in dispute. Respondent agrees that contract negotiation fees and costs and sales license expenditures are deductible. With respect to the balance of the items, respondent has stipulated that Horton actually paid the full amounts claimed and that all substantiation requirements of section 274 have been met. Based on this stipulation of the parties, and by reason of our holding that Horton's employment in California was temporary, we find that Horton is entitled to a deduction in 1978 for meals and lodging in the amount of $6,507 as claimed.

Horton testified that he made numerous telephone calls seeking employment and discussing legal matters with his attorney as well as personal telephone calls. His tax records show that for the 1978 year, he incurred $687 in telephone expense, which at the time he filed his return he allocated between business and personal in the amounts of $517 and $169, respectively. We accept his testimony and have no

reason to disregard his allocation. Moreover, respondent has apparently also accepted this evidence since this item was not questioned by respondent on brief. Therefore, we find that Horton is entitled to a deduction for business telephone calls in the amount of $517.

Horton's expenditures for business cards for his real estate business and for professional publications including the Hockey News are justified and the amounts are reasonable. We allow these items as deductions. Horton has not, however, demonstrated that his expenditure of $28 for tickets for a potential investor in one of the Pacific Coast teams was an ordinary and necessary business expense. Neither is there a basis for an allowance of a miscellaneous item in the amount of $20.

Two of the remaining items are automobile expenses and U-Haul costs. The parties have stipulated that petitioner expended $1,489 for travel between Michigan and California, $1,192 for travel while in California, and $298 for travel while employed as a real estate salesman. In addition, the rental of a U-Haul trailer in California to carry clothing and equipment from Michigan to California cost $312. Since Horton's employment was temporary, travel expense including the use of a U-Haul trailer is deductible in the aggregate amount of $2,993.[6] In addition, his travel as a real estate agent during the summer in Michigan costing $298 is a legitimate business expense.

The final item of expense which is in controversy is the sum of $346 for "Conditioning Equipment and Costs." For convenience, we will sever and reserve our opinion on this deduction at this time.

The remaining items are the additions to tax under section 6651(a) for failure to file a timely income tax return and under section 6653(a) for negligence or intentional disregard of the rules and regulations. Petitioners have offered no explanation for failing to file the income tax return on time. Neither during the trial nor on brief did Horton discuss the negligence addition. The burden of proof on both of these items is upon Horton. Rule 142. We thus

---

[6]Horton's travel expense on the road with his team was paid by the two hockey clubs with whom Horton was playing. However, he incurred automobile expense between his places of lodging and hockey rinks as well as to and from airports.

have no choice but to hold for respondent on these two additions to tax.

> *An appropriate order dismissing the case with respect to Sharon A. Horton will be entered; an appropriate order as to William H. Horton will be entered.*