BERTRAM W. COLTMAN, JR., ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Coltman v. Commissioner
Docket Nos. 34415-86, 34536-86, 2551-87, 2727-87
United States Tax Court
T.C. Memo 1991-127; 1991 Tax Ct. Memo LEXIS 146; 61 T.C.M. (CCH) 2207; T.C.M. (RIA) 91127; March 21, 1991, Filed *146 Decisions will be entered under Rule 155. Shelby H. Kanarish and Lawrence J. Lipsky, for the petitioner in docket Nos. 34415-86 and 2551-87. Mark J. Unterberger, for the petitioner in docket Nos. 34536-86 and 2727-87. J. Burk McNamara, Michael C. Whelan, and Steedly Young, for the respondent. WHALEN, Judge. WHALEN
MEMORANDUM FINDINGS OF FACT AND OPINION Respondent determined the following deficiencies in, and additions to, petitioners' Federal income taxes: Petitioner
Year
Deficiency
6651(a)(1)
Bertram W.
1982
$ 23,712.00
$ 1,016.00
Coltman, Jr.
1983
11,059.00
-0-   Michelle Coltman
1982
23,734.00
-0-   1983
7,183.00
-0-   Additions to Tax, Sections
Petitioner
6653(a)(1)
6653(a)(2)
6661
Bertram W.
-0-   -0-   -0-  Coltman, Jr. $ 552.00
*    $ 1,000.00
Michelle Coltman
-0-   -0-   -0-  359.15
*    626.80
(All section references are to the Internal Revenue *147 Code of 1954 as amended.) After concessions, the issues for decision are: (1) Whether certain payments made by Mr. Bertram W. Coltman, Jr., for the support of his former wife, Ms. Michelle Coltman, are includable in Ms. Coltman's gross income under section 71(a)(3) and deductible from Mr. Coltman's gross income under section 215(a), as Mr. Coltman contends, or whether the payments are neither includable in Ms. Coltman's gross income nor deductible by Mr. Coltman, as respondent and Ms. Coltman contend; and (2) whether Mr. Coltman is liable for an addition to tax under section 6651(a)(1) for failure to file a timely 1982 Federal income tax return. FINDINGS OF FACT Some of the facts have been stipulated by the parties and are so found. The Joint Stipulation of Facts and attached exhibits are incorporated herein by this reference. Mr. Coltman was the chief executive officer and principal shareholder of Republic Molding Corporation, a manufacturer of plastic housewares. On November 24, 1964, he married Ms. Coltman in Carson City, Nevada. Subsequently, they had two children, Bertram W. Coltman III, born October 12, 1965, and Rudyard J. Coltman, born December 22, 1967. Mr. Coltman *148 also had a son, Kevin, from a former marriage. During their marriage, Mr. and Ms. Coltman resided with their two sons and a maid in a house located at 1620 Tower Road, Winnetka, Illinois (the Winnetka house). The Winnetka house is a large ranch-style house with four bedrooms, three bathrooms, a library, a kitchen, a living room, a garage, and a swimming pool. The house was owned by Mr. Coltman, who had purchased it prior to their marriage. On August 31, 1979, Ms. Coltman filed an action for divorce in the Circuit Court of Cook County, Illinois, County Department, Domestic Relations Division, Action No. 79 D 18908. The Circuit Court of Cook County entered an agreed order in the divorce action on February 6, 1980, which directed Mr. Coltman to make monthly payments to Ms. Coltman, commencing February 1, 1980, "for her support and that of the two minor children" and to defray certain other expenses. The agreed order also directed Ms. Coltman to "fully provide all necessary day-to-day support for herself and the children." On June 30, 1981, the Circuit Court of Cook County entered a second support order which modified the agreed order of February 6, 1980, by directing Mr. Coltman *149 to pay $ 4,000 per month to Ms. Coltman commencing as of June 1, 1981, "as and for her support and that of the two minor children." The second support order also required Ms. Coltman to "directly and fully provide all necessary day-to-day support for herself and the children." Pursuant to the second support order, Mr. Coltman paid $ 48,000 to Ms. Coltman during calendar year 1982, and $ 20,000 during the first five months of 1983. Despite the pending divorce action, Mr. and Ms. Coltman continued to live in the Winnetka house. They slept in separate rooms but they both had access to all entrances to the house, and they both regularly used the common areas of the house, such as the kitchen, living room, garage, yard, and certain bathrooms. While they minimized their contact with each other, Mr. and Ms. Coltman occasionally went out to dinner together. Ms. Coltman continued to keep her personal effects in the master bedroom where Mr. Coltman slept. Mr. Coltman paid for all household expenses, except for food and "personal expenses" for Ms. Coltman and the children. Mr. Coltman usually purchased his own food and prepared his own meals separately from Ms. Coltman and the children. *150 Sometimes he would order takeout food and eat it with the children, but not with Ms. Coltman. He also laundered his clothing and received his personal mail at the Winnetka house. He purchased personal items at a local pharmacy. Ms. Coltman supervised the provision of clean towels and linens, and household articles and supplies, to Mr. Coltman. Mr. Coltman used the Winnetka house to perform his paternal or family functions with respect to his two sons. As was true before the divorce action was filed, Mr. Coltman continued to spend a considerable amount of time away from the Winnetka house, after the action was filed. Mr. Coltman occasionally went on foreign and domestic business trips. He often went to Kenosha, Wisconsin, where he subleased an apartment from Republic Molding Corporation and docked his boat, the "Microette." He also went to Key Colony Beach, Florida, where he owned a condominium and docked his other boat, the "Freezette." He used the apartment and condominium during the summer and winter months, respectively, to facilitate the pursuit of his avid and longstanding interests in boating and fishing. Mr. Coltman was away from the Winnetka house on numerous weekends, *151 on some holidays, and sometimes on one or two other nights each week, generally Wednesdays, particularly during the summer months. Most of the time which Mr. Coltman spent away from the Winnetka house was spent in Kenosha. Kenosha is approximately an hour's drive away from Mr. Coltman's office in Niles, Illinois, at Republic Molding Corporation. It is slightly closer to the Winnetka house than to his office. This proximity of Kenosha enabled Mr. Coltman to pursue his interest in boating and fishing on a regular basis. Beginning in the latter part of 1981, Mr. Coltman also had a girlfriend in Kenosha, Ms. Geraldine Davis, with whom he was intimately involved. Mr. Coltman would frequently spend the night with Ms. Davis in Kenosha and drive to the Winnetka house in the early morning. On such occasions, he would arrive at the Winnetka house, shave, shower, change clothes, have coffee and breakfast, read the newspaper, and leave for work before Ms. Coltman rose. On other occasions, after he slept at the Winnetka house, he would usually rise, follow the same routine, and leave for work before Ms. Coltman awoke. This pattern resulted in Mr. Coltman's being physically present in *152 the Winnetka house for at least some time during most days of the week. On December 10, 1981, prior to the period at issue, Mr. Coltman filed a pleading in the divorce action entitled "Counter-Petition to Reduce Temporary Support and for Other Relief." Paragraph 6 of that pleading states as follows: 6. Both the February 2, 1980 agreed order and the June 30, 1981 court-imposed order were entered based upon the assumption that the amount paid by respondent to petitioner for her support and that of the minor children would, in fact, be deductible for federal and state income tax purposes. Petitioner, personally and by and through her counsel, has firmly stated on several occasions that her counsel has and will continue to advise petitioner that said sums received by her are not properly includable in her income under Section 71 of the Internal Revenue Code and hence need not and should not be reported for federal income tax purposes. Said advice and statement are based upon petitioner's and her counsel's adherence to and acceptance of a recent Tax Court decision, Alexander [sic] v. Commissioner, CCH Dec. 38,250, issued on September 23, 1981 [Washington v. Commissioner, 77 T.C. 601 (1981)], *153 a copy of which is attached hereto and made a part hereof as Exhibit "D." Said case essentially holds that parties are not "separated" for purposes of deductibility of temporary support payments while residing in the same domicile. It is thus possible that the FOUR THOUSAND DOLLARS ($ 4,000) per month hereinbefore ordered by this Court will not be deductible by respondent or taxable to petitioner, contrary to the basic assumption of this Court in both granting and increasing the amount of the allowance.
During 1982 and the first five months of 1983, the period at issue, Mr. Coltman had an Illinois driver's license, and was registered to vote in Illinois. He also filed 1982 and 1983 State income tax returns in Illinois. Such returns report his "present address" to be "c/o Republic Molding Corp 6330 W Touhey Ave, Chicago Illinois, 60658." He did not obtain a driver's license, register to vote, or file a tax return in another State. An application for extension of time to file Mr. Coltman's 1982 Illinois return was filed on his behalf which lists the address of the Winnetka house as his "address." On his 1983 Illinois return, he claimed a deduction for "Illinois property taxes *154 paid" on his "personally owned principal residence." The deduction was for taxes paid on the Winnetka house. On September 7, 1982, during a hearing in the divorce action on the grounds for the divorce, Ms. Coltman testified under oath that both she and Mr. Coltman lived at the Winnetka house. She stated that she had a medical condition, for which she was being treated by a physician, caused by Mr. Coltman's conduct and by the fact that they both still lived in the same house. She further testified that since September 15, 1979, she and Mr. Coltman were in fact "living separate and apart except both have been living under the same roof." Neither Mr. Coltman nor his counsel controverted her testimony at that time. During proceedings in the divorce action held on November 22, 1982, Mr. Coltman was asked by his attorney to state when he had lived at the Winnetka house "on a full or part time basis continuously." He answered, "since 1959." Mr. Coltman also agreed with his attorney's statement that he was "still a part-time resident there." He gave similar testimony during a pre-trial deposition in September 1982. On May 19, 1983, the Circuit Court of Cook County entered Judgement *155 of Dissolution of Marriage, which, as part of the division of marital property, awarded the Winnetka house to Ms. Coltman. The judgment also provided that: MARITAL DEBTS AND LIABILITIES
8.1 During the pendency of this action, the Wife has failed to include certain capital gains and maintenance payments in her gross income for federal and state income tax purposes. Although the parties have filed separate returns, if any tax liability should accrue to the Husband by virtue of the Wife's failure to so include said items, the Wife shall reimburse the Husband therefor and in all respects shall indemnify him and hold him harmless with respect thereto.
On June 1, 1983, Ms. Coltman filed a "petition" in the divorce action seeking clarification of certain rights and duties of Mr. Coltman under the above Judgement of Dissolution of Marriage, including his right to continue to reside at the Winnetka house. Ms. Coltman asked the court to order him to vacate the house. By order entered June 7, 1983, the court directed Mr. Coltman to "forthwith vacate the marital premises." When Mr. Coltman complied with the Court's order, his personal effects were such that he was able to remove *156 them in his automobile. Ms. Coltman appealed the Judgement of Dissolution of Marriage and Mr. Coltman cross-appealed. Thereafter, they entered into a Settlement Agreement dated January 15, 1986, (Settlement Agreement) which they presented to the Circuit Court of Cook County. The court accepted the terms of the Settlement Agreement and on February 6, 1986, entered a Supplemental and Modified Judgement of Dissolution of Marriage which included the Settlement Agreement as a part thereof and ordered the Judgement of Dissolution of Marriage modified to the extent necessary to comport with the Settlement Agreement. The Settlement Agreement provides that on the effective date Ms. Coltman would "take all actions necessary to effect a dismissal with prejudice" of her appeal and that Mr. Coltman would simultaneously effect a dismissal with prejudice of his cross-appeal. The Settlement Agreement was intended to resolve certain controversies between Mr. and Ms. Coltman, "including * * * income tax matters." It described the status of their income tax matters as follows: For the years 1980, 1981 and 1982, the parties did not file federal and state income tax returns using the filing status *157 of "married individuals filing joint returns," and in lieu thereof, each party filed separate federal and state income tax returns for said years. At the present time, the parties' respective federal income tax returns for said years are under review by the Internal Revenue Service. In addition to the foregoing, each of the parties' federal income tax returns for 1983, filed after the dissolution of the marriage, is under review by the Internal Revenue Service. Each party hereby represents and warrants to the other that said review by the Internal Revenue Service remains open, pending and unresolved with respect to the years 1980, 1981, 1982 and 1983.
Mr. and Ms. Coltman agreed to resolve the dispute between them concerning the income tax treatment of the "support payments" to Ms. Coltman for taxable years 1980 and 1981 but not for 1982 and 1983. The Settlement Agreement provides as follows: The parties are desirous of resolving any and all disputes which exist between them as a result of: * * * iv. The parties' respective federal and state income tax returns for the years 1980 and 1981, but specifically excluding any disputes arising from the parties' respective *158 federal and state income tax returns for the years 1982 and 1983 * * * [Emphasis supplied.]
In order to effectuate the above objective, Mr. and Ms. Coltman agreed to file amended Federal and State income tax returns for 1980 and 1981 "using the filing status 'married individuals filing joint returns.'" As stated in the Settlement Agreement, Mr. and Ms. Coltman filed separate Federal income tax returns for calendar years 1982 and 1983 on which they each claimed the filing status of "married filing separate return." Ms. Coltman's returns list the address of the Winnetka house as her "present home address." Mr. Coltman's returns list the address of Republic Molding Corporation as his "present home address." However, the Forms W-2, which were attached to Mr. Coltman's 1982 return from Ajax Plastics Products Company and Republic Molding Corporation, use the address of the Winnetka house as his "address." Mr. Coltman filed Form 4868, Application for Automatic Extension of Time to File U.S. Individual Income Tax, and was granted an automatic extension until August 15, 1983, to file his 1982 return. The application uses the address of the Winnetka house as his "present home address." *159 His 1982 return was stamped by the Internal Revenue Service Center in Kansas City, Missouri, as follows: "Envelope Post Marked August 17, 1983, Mail Unit KC" and "Received Internal Revenue Service, August 19, 1983, Kansas City, MO. 64999, No. 21." On their respective 1982 and 1983 returns, Mr. Coltman deducted the subject payments as "alimony paid," but Ms. Coltman did not include them in her income. In notices of deficiency issued to Ms. Coltman, respondent determined that the payments constituted alimony or separate maintenance payments, and accordingly increased her income by such amount. In notices issued to Mr. Coltman, respondent determined that the payments did not constitute alimony or separate maintenance payments, and accordingly disallowed the amounts deducted for such payments. Respondent also determined that Mr. Coltman's 1982 return had not been timely filed and that he is liable for an addition to tax under section 6651(a)(1). At the time they filed their respective petitions in these cases, Mr. Coltman resided in Key Colony Beach, Florida, and Ms. Coltman resided in Glencoe, Illinois. OPINION At issue in these consolidated cases is the treatment of monthly payments, *160 each in the amount of $ 4,000, which Mr. Coltman made to Ms. Coltman during 1982 and the first five months of 1983, pursuant to the Order of the Circuit Court of Cook County, entered on June 30, 1981. Under the court's order, the subject payments to Ms. Coltman were in the nature of "support" pending resolution of the divorce action. Generally, payments made in discharge of a husband's obligation to support his wife are not deductible by him or includable in the wife's gross income, unless they fall within the provisions of sections 71 and 215. See Gould v. Gould, 245 U.S. 151, 62 L. Ed. 211, 38 S. Ct. 53 (1917); Sydnes v. Commissioner, 68 T.C. 170, 174-175 (1977), affd. in part and revd. and remanded in part 577 F.2d 60 (8th Cir. 1978). Section 71(a) defines which payments are includable in a wife's gross income. Deductibility of the payments by a husband is defined by section 215 in terms of their includability in the wife's gross income under section 71. That is, a husband can deduct the payment if it is includable in the wife's gross income. Sec. 215(a). In this case, we apply sections 71 and 215 as in effect during the years at issue, 1982 and *161 1983. In passing, we note that both sections were amended by section 422 of the Deficit Reduction Act of 1984, Pub. L. 98-369, 98 Stat. 795, and further amended by the Tax Reform Act of 1986, Pub. L. 99-514, 100 Stat. 2085. The 1984 amendments generally apply to divorce or separation instruments executed after 1984. Deficit Reduction Act of 1984, Pub. L. 98-369, sec. 422(e), 98 Stat. 798. The 1986 amendments generally apply to instruments executed after 1986. Tax Reform Act of 1986, Pub. L. 99-514, sec. 1843(c)(2)(A), 100 Stat. 2853. Neither the 1984 amendments nor the 1986 amendments apply in this case. The subject payments were not made pursuant to a decree of divorce or separate maintenance, such as that described in section 71(a)(1), nor were they made pursuant to a written separation agreement, such as that described in section 71(a)(2). Thus, the subject payments are includable in Ms. Coltman's gross income and are deductible by Mr. Coltman only if they are the type of payments described in section 71(a)(3). As in effect during the years at issue, section 71(a)(3) provided as follows: (3) Decree for Support. -- If a wife is separated from her husband, the wife's *162 gross income includes periodic payments (whether or not made at regular intervals) received by her after the date of the enactment of this title from her husband under a decree entered after March 1, 1954, requiring the husband to make the payments for her support or maintenance. This paragraph shall not apply if the husband and wife make a single return jointly.
Section 215(a) provided that: (a) General rule. -- In the case of a husband described in section 71, there shall be allowed as a deduction amounts includible under section 71 in the gross income of his wife, payment of which is made within the husband's taxable year. * * *
The regulations interpreting section 71 provide that a husband and wife must be "separated and living apart" at the time support payments are made in order for such payments to qualify under the statute. Sec. 1.71-1(b)(3)(i), Income Tax Regs.
In this case, the parties agree that all of the requirements of section 71(a)(3) are met, except the requirement that the "wife is separated from her husband." Mr. Coltman contends that he was "separated" from Ms. Coltman within the meaning of section 71(a)(3), with the result that the payments are *163 deductible under section 215(a). Ms. Coltman contends that she was not separated from Mr. Coltman, with the result that the payments are not includable in her income under section 71(a)(3). Respondent contends that Mr. and Ms. Coltman were not separated and that the subject payments are not includable in Ms. Coltman's income under section 71(a)(3) and are not deductible by Mr. Coltman under section 215(a). Respondent concedes that, to the extent the payments are not deductible by Mr. Coltman, they are not includable in Ms. Coltman's income, contrary to the determination which he made in the notice of deficiency issued to Ms. Coltman. We agree with respondent and Ms. Coltman. At the outset, we note that the divorce court's order of June 30, 1981, describes the payments at issue in this case "as and for [Ms. Coltman's] support and that of her two minor children." The court's order does not, however, "expressly specify or 'fix' a sum certain or percentage of the payment for child support," see Commissioner v. Lester, 366 U.S. 299, 303, 6 L. Ed. 2d 306, 81 S. Ct. 1343 (1961), and none of the parties in this case argues that the payments are for support of minor children within the meaning of *164 section 71(b), in whole or in part. This and other courts have held that a husband and wife are not "separated" within the meaning of section 71(a)(3) unless they are living in separate residences. Lyddan v. United States, 721 F.2d 873, 876 (2d Cir. 1983), cert. denied 467 U.S. 1214, 81 L. Ed. 2d 363, 104 S. Ct. 2656 (1984); Washington v. Commissioner, 77 T.C. 601, 605 (1981); Sydnes v. Commissioner, supra. We have stated the reasons for this rule as follows: The statutory history of the 1954 changes emphasizes that the factual status of whether the parties are separated rather than their marital status under local law is the key in determining whether amounts paid under a court order are includable in the recipient's gross income and deductible by the payor. See S. Rept. No. 1622, 83d Cong., 2d Sess. 10 (1954). We conclude that "separated" as used in the statute and "separated" as used in the regulations mean living in separate residences. Only when living in separate residences do the parties incur the duplicate living expenses normally incurred by divorced or separated couples. In the absence of such duplication, and in the absence of any legislative *165 history cited to us which expressly elucidates what Congress intended, we find it hard to believe that a mere continuation of shared living expenses following estrangement was intended by Congress to generate a deduction when the identical expenses would have been unavailable to the husband as a deduction before the estrangement took place. Moreover, the Court should not be required to delve into the intimate question of whether husband and wife are in fact living apart while residing in the same house. We therefore conclude that petitioner and Lugene were not separated during the period from April 1 to July 9, 1971, and that petitioner is not entitled to a deduction under section 215 for the temporary support payments made to Lugene. [Sydnes v. Commissioner, supra at 175-176.]
Washington v. Commissioner, supra at 604-605; see also Lyddan v. Commissioner, supra at 875-876. Mr. Coltman urges us to adopt the contrary view of the Court of Appeals for the Eighth Circuit, set forth in Sydnes v. Commissioner, 577 F.2d 60 (8th Cir. 1978), affg. in part and revg. and remanding in part 68 T.C. 170 (1977), *166 that a husband and wife who occupy the same residence can nonetheless satisfy the separated and living apart requirement of section 71(a)(3). Among other things, Mr. Coltman argues that the amendment of section 71 by section 422 of the Deficit Reduction Act of 1984, Pub. L. 98-369, 98 Stat. 795 (the 1984 Act), "clarifies what Congress originally intended as to the separation requirement," i.e., that Congress intended the word "separated," as used in the statute prior to the above amendment, to be construed in same manner it is construed by the Eighth Circuit in Sydnes v. Commissioner, supra. In support of this argument, he notes that the 1984 Act eliminated the requirement that spouses be "separated." In lieu thereof, section 71(b)(1)(C), as enacted by the 1984 Act, provides that the spouses can "not [be] members of the same household at the time" such payments are made, and imposes this restriction only if the payor was "legally separated from his spouse under a decree of divorce or of separate maintenance." Mr. Coltman argues that, under the amended statute, he could properly have deducted the subject payments, while living in the same residence with Ms. Coltman, because *167 he and Ms. Coltman were not "legally separated" at that time. See sec. 1.71-1T(b), Q&A-9, Temporary Income Tax Regs., 49 Fed. Reg. 34455 (Aug. 31, 1984). We find nothing in the legislative history of the 1984 Act which suggests that Congress intended the amendment of section 71, described above, to clarify prior law or disapprove our interpretation of section 71 or to favor the view of the Eighth Circuit. See H. Rept. 98-432 (Pt. 2), at 1494-1497 (1984); H. Rept. 98-861 (1984); Staff of the J. Comm. on Taxation, General Explanation of the Revenue Provisions of the Deficit Reduction Act, at 713-716 (J. Comm. Print 1984). In fact, to the contrary, we believe the opposite is true. The legislative history of the 1984 Act suggests that our interpretation of the separated and living apart requirement of section 71(a)(3) is correct. The 1984 Act amendments of sections 71 and 215 originated in the House of Representatives and the Senate bill contained no similar provisions. H. Rept. No. 98-861, supra at 1116-1118. The House Report states as follows: When tax rates were increased significantly in 1942, Congress recognized that the higher tax rates would intensify *168 the hardship of payment of alimony out of after-tax income. Congress, therefore, enacted provisions in the Revenue Act of 1942 to require that certain alimony payments be included in the recipient spouse's income and to permit the payor spouse to deduct those payments as an itemized deduction. These provisions applied to alimony payments made by persons who were divorced or legally separated. In 1954, the alimony provisions were extended to apply to payments made under a decree for support where the parties are physically separated. The Tax Reform Act of 1976 permitted alimony to be deducted in arriving at adjusted gross income so that a taxpayer who does not itemize deductions may nevertheless deduct alimony. [H. Rept. 98-432 (Pt. 1), at 193-194 (1983); emphasis supplied.]
Thus, the legislative history of the 1984 Act describes the version of section 71(a)(3) at issue in this case as requiring "physical" separation. Moreover, the Conference Report notes that "the House bill repeals the present law requirements to qualify as alimony" (emphasis supplied) and refers to the amended version of section 71, including section 71(b)(1)(C), on which petitioner relies, as *169 "new requirements." H. Rept. No. 98-861, supra at 1116. Mr. Coltman's other arguments have previously been addressed in our opinion in Washington v. Commissioner, supra, and need not be addressed again here. Suffice it to say that we have previously noted our disagreement with the Court of Appeals for the Eighth Circuit. See Washington v. Commissioner, supra at 605; LaBow v. Commissioner, T.C. Memo 1987-191; LaBow v. Commissioner, T.C. Memo 1983-417, affd. in part and revd. and remanded in part 763 F.2d 125 (2d Cir. 1985); Hertsch v. Commissioner, T.C. Memo 1982-109. Mr. Coltman's arguments in this case fail to convince us to think differently. It continues to be our view that "Congress intended that a husband and wife should not be treated as 'separated and living apart' when both are living under the same roof." Washington v. Commissioner, supra at 605. The record in this case shows that Mr. Coltman lived under the same roof with Ms. Coltman at the Winnetka house and, thus, is not entitled to deduct the subject payments *170 to Ms. Coltman under section 215. Lyddan v. United States, supra; Washington v. Commissioner, supra. Mr. Coltman performed all functions at the Winnetka house which a person normally performs at his or her residence: he ate there; he slept there; he showered there; he dressed there; he did his laundry there; he cooked and ate his meals there; he read his morning newspaper and had coffee there prior to going to work; he received his personal mail there; and he performed his fatherly duties there. Although he and Ms. Coltman slept in separate rooms, and had little contact with each other, they nonetheless shared the entrances and other common areas of the same house "under the same roof." The record also shows that Mr. Coltman considered the Winnetka house to be his personal residence. He listed that address as his "present home address" for tax purposes on several occasions, and continued to receive his personal mail there for other purposes as well. He also stated during the divorce proceedings that he resided at the Winnetka house. After the divorce was final, and the Winnetka house had been awarded to Ms. Coltman, it was necessary *171 for her to institute legal proceedings to force Mr. Coltman to vacate the premises. Mr. Coltman points to the fact that he spent substantial amounts of time away from the Winnetka house while boating, fishing, and seeing his girlfriend in Kenosha, and while traveling in Florida and abroad. However, it is clear that he did not move from the Winnetka house in the sense that another location became his primary dwelling. Even after the weekends and week nights he spent in Kenosha, Mr. Coltman would return to the Winnetka house to shower, shave, change clothes, have coffee, read the newspaper, and go to work. His situation was no different from that of a person who has a primary residence in the metropolitan area in which he works, and a "getaway" house at which he spends weekends and perhaps a few other nights per week. Such a pattern certainly does not indicate that the person had "moved" from his residence in town to the weekend getaway. Moreover, Mr. Coltman did not "move" to the Kenosha apartment. He kept his personal clothing and effects at the Winnetka house, and continued to perform personal domestic functions there. He did not commute to his office directly from Kenosha, *172 but rather stopped at the Winnetka house first before going to work. Mr. Coltman did not obtain a Wisconsin driver's license, register to vote in Wisconsin, or file Wisconsin income tax returns. Instead, he performed all such functions in Illinois. Mr. Coltman argues that he incurred "duplicative expenses" in the rental of the Kenosha apartment. We note, however, that Mr. Coltman incurred these expenses in connection with his fishing and boating activities and had incurred similar expenses for a number of years prior to the divorce proceedings. Mr. Coltman had spent approximately the same amount of time away from the Winnetka house prior to the institution of the divorce proceedings. In our view, the costs incurred in using the Kenosha Apartment were not expenses incident to Mr. Coltman's marital estrangement. Rather, they were "a mere continuation of shared living expenses following estrangement" which "would have been unavailable to [Mr. Coltman] as a deduction before the estrangement took place," and not "duplicative living expenses normally incurred by divorced or separating couples." See Washington v. Commissioner, supra at 604, quoting Sydnes v. Commissioner, supra at 176. *173 Mr. Coltman would also have us believe that, after the divorce trial began in October 1982, he essentially moved to Kenosha and lived there exclusively. Both he and Ms. Davis, his former girlfriend, testified to that effect. Nevertheless, we find Mr. Coltman's testimony to be selfserving and Ms. Davis to be less than a disinterested witness. Specifically, we note that Ms. Davis is employed by Mr. Coltman and that she had received certain other payments of money from him. On the other hand, Mrs. Shirley Strokis, who lived in Kenosha and cleaned Mr. Coltman's apartment on a regular basis, and whose husband was the captain of Mr. Coltman's boat, testified that, in May of 1983, Mr. Coltman was not living full-time in Kenosha, but was only there on weekends and one or two nights a week. This testimony is consistent with that of Ms. Coltman, and we so find. Finally, Mr. Coltman contends that the Circuit Court of Cook County, in the Judgement of Dissolution of Marriage quoted above, intended Ms. Coltman to bear the income tax burden with respect to the "support" payments. While the original divorce judgment appears to so provide, it is clear that the order of a State court or the *174 intention of a State court judge in rendering a divorce decree does not determine the Federal income tax consequences of the divorce judgment he renders. Bardwell v. Commissioner, 318 F.2d 786, 789 (10th Cir. 1963), affg. 38 T.C. 84 (1962); Pierce v. Commissioner, 66 T.C. 840, 846 (1976); Joslin v. Commissioner, 52 T.C. 231 (1969), affd. 424 F.2d 1223 (7th Cir. 1970); see also United States v. Mitchell, 403 U.S. 190, 197, 29 L. Ed. 2d 406, 91 S. Ct. 1763 (1971); Imel v. United States, 523 F.2d 853 (10th Cir. 1975). Moreover, it is clear from the "Counter-Petition to Reduce Temporary Support and for Other Relief" which Mr. Coltman filed in the divorce action on December 10, 1981, prior to the period at issue, that Ms. Coltman did not agree that the monthly "support" payments made by Mr. Coltman were includable in her gross income under section 71(a)(3). Ultimately, the parties resolved their differences on this issue with respect to the payments made during 1980 and 1981 by filing joint Federal income tax returns for those years but left this issue open with respect to the payments *175 at issue. The Judgement of Dissolution of Marriage was amended by the divorce court to reflect that agreement. The Counter-Petition to Reduce Temporary Support and for Other Relief, filed by Mr. Coltman in the divorce case on December 10, 1981, is significant for another reason. It shows that Mr. Coltman was well aware of the decision of this Court in Washington v. Commissioner, supra, and our position that a husband and wife cannot be "separated" for purposes of section 71(a)(3) while residing in the same house. Mr. Coltman, nevertheless, failed noticeably to alter his behavior to "separate" himself from Ms. Coltman, and, thus, become eligible to deduct the payments under section 215. Mr. Coltman proposes "an alternative course of action" to the Court. He asks the Court to "apportion the income/deduction in accordance with the time [he] was not living in Winnetka, based on the measure of days slept there versus days slept elsewhere." According to Mr. Coltman, under that approach, he would be entitled to deduct 68.5 percent of the payments in 1982 and 85.7 percent in 1983. Mr. Coltman cites LaBow v. Commissioner, T.C. Memo 1987-191, *176 as authority for his alternative contention. In that case, the Court determined that the taxpayers were "separated and living apart" for purposes of section 71(a)(3) during the period May 30, 1975, through October 1, 1976, but not for the periods January 1, 1975, through May 29, 1975, and October 1, 1976, through December 31, 1976. Accordingly, the Court permitted the deduction of payments made by Mr. LaBow during months the taxpayers were separated, and required the inclusion of such payments in Ms. LaBow's income. In this case, as set forth above, we have found that, even though Mr. Coltman spent a substantial amount of time away from the Winnetka house, he lived with Ms. Coltman continuously under the same roof at the Winnetka house from January 1, 1982, through May 31, 1983. There are no discrete and readily identifiable periods of time, during which the parties "separated," as in LaBow v. Commissioner, T.C. Memo 1987-191. Based upon our finding that Mr. and Ms. Coleman lived under the same roof throughout the entire period in issue, we hold that they were not "separated and living apart" for purposes of section 71(a)(3) and that the subject payments *177 are not deductible by Mr. Coltman nor includable in Ms. Coltman's income. Next, we must decide whether Mr. Coltman is liable for an addition to tax under section 6651(a)(1) with respect to his 1982 return. Section 6651(a)(1) imposes an addition to tax for failure to file a timely tax return, "unless it is shown that such failure is due to reasonable cause and not due to willful neglect." The burden is on the taxpayer to prove either that the return was timely filed, or that the failure is due to reasonable cause and not willful neglect. United States v. Boyle, 469 U.S. 241, 245, 83 L. Ed. 2d 622, 105 S. Ct. 687 (1985); Horton v. Commissioner, 86 T.C. 589, 597 (1986); Davis v. Commissioner, 81 T.C. 806, 820 (1983), affd. without published opinion 767 F.2d 931 (9th Cir. 1985); Rule 142(a), Tax Court Rules of Practice and Procedure. In order to prove "reasonable cause," a taxpayer must show that he exercised ordinary business care and prudence and was nevertheless unable to file the return within the prescribed time. Sec. 301.6651-1(c)(1), Proced. & Admin. Regs. In order to disprove "willful neglect," a taxpayer must prove that the late *178 filing did not result from "a conscious, intentional failure or reckless indifference." United States v. Boyle, supra at 245-246. In this case, Mr. Coltman obtained an automatic extension of the time in which to file his 1982 return until August 15, 1983. The parties have stipulated that the Internal Revenue Service stamped Mr. Coltman's return as postmarked August 17, 1983, and received August 19, 1983. To satisfy his burden of proof, Mr. Coltman simply testified that it was his "understanding" that the return was timely filed. He also testified that Mr. Lawrence J. Lipsky, a Certified Public Accountant who had prepared his returns for approximately 30 years, and who is Mr. Coltman's counsel in this case, usually prepared his returns and gave them to him to sign and mail. Mr. Lipsky did not testify. Mr. Coltman further testified that on one occasion he had previously filed a delinquent return. Based solely on Mr. Coltman's brief, vague testimony of his "understanding" that the subject return was timely, he argues that the return must have been filed in a timely fashion because "he has filed tax returns for years, understands the significance of late *179 filing, and would have recalled if he had mailed it late." He also argues that he "has made an affirmative showing that he filed timely, by testifying that in his entire life, only once did he file late and would have known and recollected if he had filed late for 1982." We conclude that Mr. Coltman's subjective "understanding" does not constitute sufficient proof that the return was timely mailed or filed. Mr. Coltman argues on brief that respondent has failed "to produce the envelope [in which the return was mailed] to demonstrate that the postmark was clearly legible or that a mistake was not made in their records." He suggests that some clerical mistake may have been made by the Internal Revenue Service, or the United States Postal Service. The record, however, contains nothing to support these contentions. We find that Mr. Coltman failed to prove that the subject return was, in fact, filed on or before the August 15, 1983, deadline. Accordingly, we find that the return was not timely filed. We note that Mr. Coltman states on brief, "Taxpayer does not attempt to argue 'reasonable cause' because, in fact, he believes he did in fact file timely." Thus, we do not consider whether *180 his failure to timely file the subject return is excused by reasonable cause. In view of the above, we sustain respondent's determination on this issue. To reflect the agreement of the parties with respect to other issues, and our conclusions set forth herein, Decisions will be entered under Rule 155. Footnotes
1. Cases of the following petitioners have been consolidated herewith: Bertran W. Coltman, Jr., docket Nos. 34415-86 and 2551-87; Michelle Coltman, docket Nos. 34536-86 and 2727-87.↩
*. 50 percent of the interest due on the deficiency.↩