SALVATORE BARBIERO, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Barbiero v. Commissioner
Docket No. 19105-90
United States Tax Court
T.C. Memo 1992-381; 1992 Tax Ct. Memo LEXIS 403; 64 T.C.M. (CCH) 59; July 7, 1992, Filed *403 Decision will be entered pursuant to Rule 155. For Salvatore Barbiero, pro se. For Respondent: Clare Wallace. RUWE
RUWE
MEMORANDUM FINDINGS OF FACT AND OPINION RUWE, Judge: Respondent determined deficiencies and additions to tax in petitioner's Federal income taxes as follows: Additions to Tax
Year
Deficiency
Sec. 6651(a)(1)
Sec. 6653(a)(1)
Sec. 6653(a)(2)
Sec. 6661
1985
$ 9,048
$ 2,262
$ 536
50 percent of
$ 2,262
the interest
due on $ 9,048
Year
Deficiency
Sec. 6651(a)(1)
1986
$ 15,661
$ 3,770
Additions to Tax
Year
Sec. 6653(a)(1)(A)
Sec. 6653(a)(1)(B)
Sec. 6661
1986
$ 783
50 percent of the
$ 3,915
interest due on
$ 15,661
The issues for decision are: (1) Whether petitioner had unreported income for the taxable years in issue; (2) whether petitioner is liable for additions to tax under section 6651(a)(1) [1] for failure to file timely his Federal income tax returns; (3) whether petitioner is liable for additions to tax under section 6653(a) for negligence or intentional disregard of rules or regulations; and (4) whether petitioner is liable for additions to tax under section 6661 for substantially understating *404 his tax liability. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and attached exhibits are incorporated herein by this reference. Petitioner resided in Trenton, New Jersey, at the time he filed his petition. During 1985 and part of 1986, petitioner operated a restaurant called Phil's Pizza Palace located at U.S. Highway 130 and State Highway 33, Robbinsville, New Jersey. Petitioner conducted his restaurant business using cash and did not maintain any bank accounts or keep any business records during the years in issue. Petitioner obtained several loans during the years in issue to sustain his business. On June 7, 1985, petitioner borrowed $ 50,000 from Rols Capital Co., Fort Lee, New Jersey. In December 1985, he borrowed $ 15,000 from the New Jersey National *405 Bank and $ 14,209.59 from his sister. Petitioner also received a loan on June 24, 1986, from Joseph Shariff in the amount of $ 25,000. During 1985 and 1986, petitioner traveled frequently to Atlantic City to gamble. Petitioner played blackjack primarily. He did not keep records of his gambling activity. Petitioner did not file his 1985 and 1986 Federal income tax returns until February 25, 1988. On those returns, petitioner reported adjusted gross income of $ 13,597 and $ 2,613, respectively. Petitioner's Federal income tax returns became the subject of examination as part of an Internal Revenue Service project to examine individuals with respect to whom the Service had received currency transaction reports by casinos (Forms 8362). Casinos file currency transaction reports (CTR's) with the Internal Revenue Service whenever a player purchases chips for more than $ 10,000 in cash during a single day. The purpose of the project was to determine whether the income reported on an individual's tax returns could support the reported casino transactions. Agent Anthony Hearn was assigned to work on petitioner's case. Upon Agent Hearn's receipt of the CTR's regarding petitioner, *406 the first thing he did was interview petitioner. In the course of the interview, petitioner stated that he was not a big gambler. Agent Hearn subsequently obtained casino records and reports pertinent to petitioner's gambling activity from Caesars Atlantic City Casino (Caesars), Bally's Park Place (Bally's), The Golden Nugget, and Trump's Castle Casino (Trump's). These casinos keep detailed computerized records of their patrons' gambling activity. Each new player is assigned an account number by the casino computer system, and that account number is used by the casino indefinitely to identify a particular player. When a player in one of these Atlantic City casinos approaches a gambling table and purchases gambling chips, a casino supervisor, called a floor person, obtains the player's identity and writes the player's name on a form known as a player rating card. In some instances the floor person may recognize a repeat player by sight and not have to ask for his name. A player who has already been assigned an account number may identify himself by producing a card issued by the casino, which states the player's name and account number. After identifying the player, the floor *407 person watches the playing action and writes the respective wins or losses of the player on the rating card. A player's wins or losses are determined by observation of the play and by counting the remaining chips in the table's controlled inventory of chips when the player leaves the gambling table. The floor person also records on the rating card the amount of gambling chips purchased and the total time the player gambled at that particular location. After filling out a rating card, the floor person gives it to the pit manager. The pit manager gives the rating card to the pit clerk who enters the information from the rating card into the computer system. Based upon the data input from the player rating cards, the casino computer system can produce a printout of a player's complete game activity including chips purchased, game played, gambling time, and wins and losses. One purpose for keeping these records is to determine "comps". A "comp" or "complimentary" is a benefit given to a player by a casino. "Comps" are based on the player's average bet and playing time. Examples of complimentaries granted by casinos include free parking, meals, hotel rooms, and reimbursement of *408 airfare. Petitioner received complimentary meals from Caesars on January 5 and 12, 1986. He also received complimentary hotel rooms, meals, and beverages from the Golden Nugget on February 5 and July 19, 1986. The Golden Nugget also gave petitioner a complimentary hotel room on July 12, 1986. Bally's provided petitioner with complimentary meals on three occasions in 1986. Respondent used casino records in order to determine petitioner's unreported income. These records include information such as petitioner's date of birth, address, and signature, and indicate that most of petitioner's gambling activity consisted of playing blackjack. Printouts of the computerized records of petitioner's gambling activity reflect purchases of chips, wins, and losses in the following amounts during 1985 and 1986: 1985
Date
Chips Purchased
Win
Loss
Casino
CTR Filed
5/27/85
$ 1,800
$ 1,500
$ --  Caesars
-- 6/02/85
500
2,700
--  Caesars
-- 6/03/85
1,050
--  1,500
Caesars
-- 6/09/85
500
--  200
Caesars
-- 6/10/85
2,000
--  1,700
Caesars
-- 6/11/85
1,000
--  700
Caesars
-- 6/15/85
2,000
--  1,300
Caesars
-- 6/16/85
1,000
3,100
-- Caesars
-- 6/17/85
1,000
1,100
-- Caesars
-- 6/18/85
500
--  300
Caesars
-- 7/03/85
500
--  -- Caesars
-- 7/04/85
2,500
400
-- Caesars
-- 7/06/85
1,600
--  600
Caesars
-- 7/07/85
500
3,500
-- Caesars
-- 7/11/85
2,100
--  2,100
Caesars
-- 7/12/85
600
2,600
--  Caesars
-- 7/13/85
4,000
--  500
Caesars
-- 7/14/85
4,100
--  4,000
Caesars
-- 7/15/85
1,000
--  900
Caesars
-- 7/16/85
1,500
--  -- Caesars
-- 8/07/85
5,700
--  1,300
Caesars
-- 8/08/85
500
--  4,000
Caesars
-- 8/11/85
500
--  500
Caesars
-- 8/12/85
1,600
--  1,300
Caesars
-- 11/27/85
10,800
--  10,600
Caesars
Yes
11/28/85
14,000
--  --  Bally's
Yes
11/30/85
2,000
--  2,300
Caesars
-- 12/21/85
4,300
3,700
--  Caesars
-- 12/22/85
1,900
5,600
--  Caesars
-- 12/28/85
860
--  900
Caesars
-- 12/29/85
500
--  500
Caesars
Yes
12/30/85
14,600
--  13,500
Caesars
Yes
12/31/85
--  --  300
Caesars
-- *409 1986
Date
Chips Purchased
Win
Loss
Casino
CTR Filed
1/01/86
$ 6,100
$ --
$ 2,100
Caesars
-- 1/03/86
12,100
--
4,200
Bally's
Yes
1/04/86
500
--
900
Caesars
-- 1/05/86
1,600
--
1,200
Caesars
-- 1/11/86
1,500
--
200
Caesars
-- 1/12/86
3,500
--
4,000
Caesars
-- 2/02/86
17,300
--
7,400
Caesars
Yes
2/05/86
20,800
--
20,900
Golden Nugget
Yes
3/06/86
--  1,900
--
Caesars
-- 3/07/86
500
--
--
Caesars
-- 3/08/86
13,400
--
2,400
Bally's
Yes
3/09/86
5,500
--
2,800
Caesars
-- 3/09/86
11,400
--
--
Trump's
Yes
4/01/86
6,000
--
2,700
Caesars
-- 4/02/86
--  200
--
Caesars
-- 5/29/86
1,540
1,610
--
Bally's
-- 5/30/86
4,500
4,400
--
Golden Nugget
-- 6/02/86
14,000
6,500
--
Golden Nugget
Yes
6/04/86
12,200
--
12,300
Caesars
Yes
6/05/86
500
--
500
Trump's
-- 6/19/86
7,200
11,500
--
Trump's
-- 6/23/86
9,300
--
5,100
Trump's
-- 7/08/86
2,700
1,650
--
Trump's
-- 7/11/86
1,500
5,100
--
Golden Nugget
-- 7/12/86
6,100
--
5,600
Golden Nugget
-- 7/25/86
--  --
300
Caesars
-- 7/28/86
6,200
--
5,300
Trump's
-- 7/29/86
700
1,600
--
Golden Nugget
-- 8/04/86
500
500
--
Golden Nugget
-- 8/05/86
1,000
100
--
Bally's
-- 8/06/86
1,100
--
700
Trump's
-- 8/07/86
500
--
500
Golden Nugget
-- 8/09/86
1,900
1,400
--
Trump's
-- 11/20/86
400
--
200
Trump's
-- 11/30/86
2,700
--
1,125
Trump's
-- 12/03/86
400
--
175
Trump's
-- 12/14/86
900
1,200
--
Trump's
-- *410 CTR's filed by the casinos show that petitioner purchased chips for cash in excess of $ 10,000 on the following dates: [2]
Date
Amount
Casino
11/27/85
$ 10,800
Caesars
11/28/85
14,000
Bally's
12/29/85
15,100
Caesars
1/03/86
12,100
Bally's.
2/02/86
17,300
Caesars
2/05/86
20,800
Golden Nugget
3/08/86
13,400
Bally's
3/09/86
11,400
Trump's
6/02/86
14,000
Golden Nugget
6/04/86
12,200
Caesars
Respondent utilized the casinos' computer-generated reports and the CTR's to calculate gambling expenditures by petitioner in 1985 and 1986. Respondent's calculations of petitioner's gambling expenditures in 1985 are set forth in a schedule attached to the statutory notice of deficiency as follows: Summary of Casino Activity for 1985
Date
Buy-In
Win or (Loss)
New Money
Balance
05/27/85
$ 1,800
$ 1,500 $ 1,800
$ 3,300 06/02/85
500
2,700 --  6,000 06/03/85
1,050
(1,500)
--  4,500 06/09/85
500
(200)
--  4,300 06/10/85
2,000
(1,700)
--  2,600 06/11/85
1,000
(700)
--  1,900 06/15/85
2,000
(1,300)
100
700 06/16/85
1,000
3,100 300
4,100 06/17/85
1,000
1,100 --  5,200 06/18/85
500
(300)
--  4,900 07/03/85
500
--   --  4,900 07/04/85
2,500
400 --  5,300 07/06/85
1,600
(600)
--  4,700 07/07/85
500
3,500 --  8,200 07/11/85
2,100
(2,100)
--  6,100 07/12/85
600
2,600 --  8,700 07/13/85
4,000
(500)
--  8,200 07/14/85
4,100
(4,000)
--  4,200 07/15/85
1,000
(900)
--  3,300 07/16/85
1,500
--   --  3,300 08/07/85
5,700
(1,300)
2,400
4,400 08/08/85
500
(4,000)
--  400 08/11/85
500
(500)
100
--   08/12/85
1,600
(1,300)
1,600
300 11/27/85
10,800
(10,600)
10,500
200 11/28/85
14,000
(14,000)
13,800
--   11/30/85
2,000
(2,300)
2,000
(300)
12/21/85
4,300
3,700 4,600
8,000 12/22/85
1,900
5,600 --  13,600 12/28/85
860
(900)
--  12,700 12/29/85
500
(500)
--  12,200 12/30/85
14,600
(13,500)
2,400
1,100 12/31/85
--  (300)
--  800 Total
$ 87,010
$ 39,600 *411 Respondent's calculations of petitioner's gambling expenditures in 1986 are set forth in a schedule attached to the statutory notice of deficiency as follows: Summary of Casino Activity for 1986
Date
Buy-In
Win or (Loss)
New Money
Balance
Carryover from 12/31/85
800
01/01/86
$ 6,100
$ (2,100)   $ 6,100 [1]
$ 4,800
01/03/86
12,100
(4,200)   7,300
7,900
01/04/86
500
(900)   --
7,000
01/05/86
1,600
(1,200)   --
5,800
01/11/86
1,500
(200)   --
5,600
01/12/86
3,500
(4,000)   --
1,600
02/02/86
17,300
(7,400)   15,700
9,900
02/05/86
20,800
(20,800) [2]
10,900
--  02/05/86
--  --      --
--  03/06/86
--  1,900    --
1,900
03/07/86
500
--      --
1,900
03/08/86
13,400
(2,400)   11,500
11,000
03/09/86
5,500
(2,800)   --
8,200
03/09/86
11,400
(11,400)   3,200
--  04/01/86
6,000
(2,700)   6,000
3,300
04/02/86
--  200    --
3,500
05/29/86
1,540
1,610    --
5,110
05/30/86
4,500
4,400    --
9,510
06/02/86
14,000
6,500    4,490
20,500
06/04/86 [3]
--  --      --
20,500
06/05/86
500
(500)   --
20,000
06/19/86
7,200
11,500    --
31,500
06/23/86
9,300
(5,100)   --
26,400
07/08/86
2,700
1,650    --
28,050
07/11/86
1,500
5,100    --
33,150
07/12/86
6,100
(5,600)   --
27,550
07/24/86 [4]
--  (300)   --
27,250
07/28/86
6,200
(5,300)   --
21,950
07/29/86
700
(1,600) [5]
--
20,350
08/04/86
500
500    --
20,850
08/05/86
1,000
100    --
20,950
08/06/86
1,100
(700)   --
20,250
08/07/86
500
(500)   --
19,750
08/09/86
1,900
1,400    --
21,150
11/20/86
400
(200)   --
20,950
11/30/86
2,700
(1,125)   --
19,825
12/03/86
400
(175)   --
19,650
12/14/86
900
1,200    --
20,850
Total
$ 163,840
$ 65,190
*412 Respondent calculated the funds expended for gambling as follows: (1) The buy-in column reflects the amount of chips purchased by petitioner at a casino on a particular date. This number is obtained directly from casino records. (2) The win/loss column reflects the amount petitioner won or lost on a particular date. This number is also obtained directly from the casino *413 records. (3) The new money column reflects the amount of money that petitioner spent in his gambling activity that came from a source other than the balance of funds available from his prior gambling activity. The total amount of new money is the amount respondent attributed to income received during the taxable year. (4) The balance column represents the fund of money from which petitioner draws to fund his buy-in. Adjustments were made to the balance column based upon the amounts which were won or lost. When the balance is less than the buy-in, new money is expended to buy-in. When the balance is greater than the next buy-in amount, no new money is expended to buy-in. The following examples illustrate these calculations. The initial buy-in on May 27, 1985, is in the amount of $ 1,800. Petitioner spent $ 1,800 of new money to begin the gambling activity. Petitioner won $ 1,500. He ends with a balance of $ 3,300. The next buy-in amount of $ 500 on June 2, 1985, can be drawn from the balance of $ 3,300. Thus, there was no new money spent on June 2, 1985. On June 2, 1985, petitioner won $ 2,700. The win is added to the previous balance which results in a balance of $ *414 6,000. On June 3, 1985, the buy-in is $ 1,050 which is funded from the previous balance of $ 6,000. There is no new money spent. The loss is $ 1,500. The loss is subtracted from the previous balance of $ 6,000 resulting in a balance of $ 4,500 on June 3, 1985. No new money was expended until June 15, 1985, when the buy-in of $ 2,000 exceeded the balance of $ 1,900 available on June 11, 1985. Petitioner spent new money in the amount of $ 100 to purchase chips. Another example of new money being spent can be found on August 7, 1985. The buy-in of $ 5,700 exceeds the previous balance of $ 3,300 available on July 16, 1985. Petitioner spent new money in the amount of $ 2,400 in order to purchase chips. The remaining calculations utilize the same method. Bally's filed a CTR for chips purchased on November 28, 1985, at Bally's in the amount of $ 14,000. Trump's filed a CTR for chips purchased on March 9, 1986, at Trump's in the amount of $ 11,400. However, the computerized records of these casinos for those particular dates indicate neither wins nor losses by petitioner. Respondent included these amounts as buy-ins on the schedules attached to the statutory notice of deficiency *415 but determined that these amounts were lost and thus did not include them in the balance of funds available for future gambling. OPINION The first issue for decision is whether petitioner had unreported income for the taxable years in issue. Respondent's determination is generally presumed correct, and petitioner bears the burden of proving that determination incorrect. Rule 142(a); Welch v. Helvering, 290 U.S. 111 (1933). Respondent resorted to an indirect method of reconstructing petitioner's income for the taxable years in issue because petitioner did not maintain or provide records of income or expenditures as required by section 6001. Sec. 1.6001-1(a), Income Tax Regs. Using the cash expenditures method, respondent determined that petitioner had unreported income in the amount of $ 39,600 in 1985 and $ 65,190 in 1986. Respondent's computation is based on the theory that, to the extent petitioner's expenditures for gambling exceeded the balance of funds available from prior gambling activity, the source of petitioner's gambling expenditures was taxable income. [3] Respondent determined that none of the gambling expenditures were attributable to income, *416 which petitioner reported on his delinquent returns, because the relatively small amounts reported would have been consumed by living expenses of petitioner and his family. The use of the cash expenditures method of computing income is a well-established method of determining a taxpayer's unreported income. United States v. Johnson, 319 U.S. 503 (1943); Taglianetti v. United States, 398 F.2d 558 (1st Cir. 1968), affd. 394 U.S. 316 (1969); United States v. Caserta, 199 F.2d 905 (3d Cir. 1952); Hoffman v. Commissioner, T.C. Memo. 1960-160, affd. 298 F.2d 784 (3d Cir. 1962). The cash expenditures method is a variant of the net worth method of establishing unreported taxable income. Hoffman v. Commissioner, 298 F.2d at 785-786; *417 Petzoldt v. Commissioner, 92 T.C. 661, 694 (1989). The cash expenditures method assumes that the amount by which a taxpayer's cash expenditures during a taxable period exceed his known sources of income for that period is taxable income, unless the taxpayer can show that his expenditures were made from some nontaxable source of funds. DeVenney v. Commissioner, 85 T.C. 927, 930 (1985). In a net worth case, precise opening and closing net worth calculations must be established with reasonable certainty. Holland v. United States, 348 U.S. 121 (1954). However, in the cash expenditures method, reasonable certainty may be established without precise net worth figures "as long as the proof * * * makes clear the extent of any contribution which beginning resources or a diminution of resources over time could have made to expenditures." Taglianetti v. United States, 398 F.2d at 565. The relevant issue in a cash expenditures case is whether any expenditures in excess of reported income can be attributed to assets available at the beginning of the relevant period or to nontaxable receipts, such as loans, gifts, *418 or inheritances. Petzoldt v. Commissioner, supra at 695 (citing Taglianetti v. United States, 398 F.2d at 566). Petitioner testified at trial but made no claim that the gambling expenditures determined by respondent came from a nontaxable source. The only evidence in the record even suggesting a potential nontaxable source of funds was the documentation pertaining to the loans received by petitioner during the years in issue. However, petitioner testified that none of those funds were expended on gambling. The only evidence which petitioner offered to refute respondent's expenditures method determination was his testimony that his gambling activity during the years in issue was not nearly as extensive as that which respondent determined based on the casino records. Petitioner admits that he gambled at Atlantic City casinos during the years in issue and that his gambling consisted primarily of playing blackjack. He testified that he did not know how frequently he gambled in Atlantic City during those years. While petitioner denied gambling in the amounts determined by respondent, he failed to offer any other evidence as to the amounts *419 he gambled or the frequency of his trips to Atlantic City. Petitioner kept no business records for the years in issue. He kept no record of his gambling activity, and he did not maintain business or personal bank accounts. Respondent has offered ample evidence of petitioner's gambling activity. Respondent introduced into evidence records of four different casinos detailing the amounts of chips purchased by petitioner and his winnings and losses. Respondent produced casino records showing that the casinos gave petitioner complimentary hotel rooms, meals, and beverages based on his gambling activity. Petitioner acknowledged his signature on receipts for complimentary meals at Caesars on January 5 and 12, 1986. Caesars' casino records verify that petitioner gambled thousands of dollars at Caesars on these same dates. Petitioner's signature also appears on receipts for complimentary hotel rooms and meals from the Golden Nugget on July 11 and 19, 1986. The Golden Nugget's computer records verify that petitioner gambled at the casino on July 11 and 12, 1986. The record contains the CTR's filed with the Internal Revenue Service by four different casinos reporting that petitioner *420 purchased chips in excess of $ 10,000 on three occasions in 1985 and on seven occasions in 1986. Various home addresses appear on the casino records which name petitioner. All the addresses contain some version or a scrambled version of petitioner's home address, 1312 Elizabeth Avenue, Trenton, New Jersey, or his business address, U.S. Highway 130 and State Highway 33, Robbinsville, New Jersey, or the address of another property petitioner owned located at 511 West Westfield Avenue, Roselle Park, New Jersey. The date of birth used for identification on the Golden Nugget casino records is the same as that of petitioner (May 2, 1948). Furthermore, petitioner testified that normally he played blackjack and all the casino records reflect this fact. Petitioner testified that he has had difficulty paying creditors since 1982. In support of his testimony, petitioner produced documents which substantiate loans he obtained in 1985 and 1986. Petitioner testified that he used the proceeds of the loans for business purposes and did not use the money for gambling. He further testified that he was about to lose his house at the time of the trial because of his failure to pay his debts. *421 We do not find petitioner's history of financial difficulty and inability to pay his debts inconsistent with the extensive gambling activities reflected in respondent's determinations. Based on the record before us, we sustain respondent's determination that petitioner had unreported income. We believe, however, that the amount of unreported income determined by respondent should be reduced by including the $ 14,000 buy-in at Bally's on November 28, 1985, and the $ 11,400 buy-in at Trump's on March 9, 1986, in the ending balance for those dates. This was not done in respondent's computations because respondent assumed that both of these amounts were lost on those respective dates. However, the casino records reflect no such losses, and we can perceive no reason to depart from respondent's otherwise consistent reliance on those records. The result of our modification to respondent's computation will be to reduce unreported income (new money) for both 1985 and 1986. [4] We,therefore, find that 1985 unreported income is $ 30,600 and 1986 unreported income is $ 49,700. *422 The next issue for decision is whether petitioner is liable for additions to tax under section 6651(a)(1) for failure to file timely Federal income tax returns. Section 6651(a)(1) imposes an addition to tax upon a taxpayer who fails to file a timely return, unless it is shown that the taxpayer's failure is due to reasonable cause and not due to willful neglect. This is essentially a question of fact, and the burden of proof is on petitioner. Rule 142(a); Horton v. Commissioner, 86 T.C. 589, 597 (1986). Petitioner filed his Federal income tax returns on February 25, 1988. The 1985 income tax return was due on April 15, 1986, and the 1986 income tax return was due on April, 15, 1987. Petitioner has failed to establish any reason or explanation for the late filing of the returns. Petitioner has not met his burden of proving his failure to file was due to reasonable cause. The next issue for decision is whether petitioner is liable for additions to tax under section 6653(a)(1) and (2) for taxable year 1985 and section 6653(a)(1)(A) and (B) for taxable year 1986. For taxable year 1985, section 6653(a)(1) imposes a 5-percent addition to tax if any part of any *423 underpayment of tax is due to negligence or intentional disregard of rules or regulations, and section 6653(a)(2) provides for a separate addition to tax equal to 50 percent of the interest payable on the portion of the underpayment attributable to negligence or intentional disregard of the rules or regulations. For taxable year 1986, section 6653(a)(1)(A) and (B) provides for additions to tax which are similar to those provided for in section 6653(a)(1) and (2). For purposes of this section, negligence is the lack of due care or failure to do what a reasonable and ordinarily prudent person would do under the circumstances. Neely v. Commissioner, 85 T.C. 934, 947 (1985). Respondent's determination of negligence is presumed correct and petitioner bears the burden of proving otherwise. Hall v. Commissioner, 729 F.2d 632, 635 (9th Cir. 1984), affg. T.C. Memo. 1982-337; Bixby v. Commissioner, 58 T.C. 757, 791 (1972). Petitioner has failed to carry his burden. Therefore, we sustain respondent's determination. Respondent also determined that petitioner is liable for additions to tax under section 6661. *424 Section 6661(a) prescribes an addition to tax of 25 percent of the amount of any underpayment of tax attributable to a substantial understatement of income tax. Pallottini v. Commissioner, 90 T.C. 498 (1988). An understatement of income tax is considered substantial if it exceeds the greater of 10 percent of the tax required to be shown on the return, or $ 5,000. Sec. 6661(b)(1). Section 6661(b)(2)(B) provides various reductions as to this addition to tax. Petitioner has not established that the understatements should be reduced as set forth in section 6661(b)(2)(B). The deficiencies that we uphold for 1985 and 1986 qualify as substantial understatements as defined in section 6661(b). Decision will be entered pursuant to Rule 155. Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the taxable years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.↩
2. The CTR's may be generated by the pit personnel when a player is witnessed purchasing chips in excess of $ 10,000, or it may be generated by the accounting department based on the reports received from the casino floor that a player has purchased chips in excess of $ 10,000.↩
1. The $ 800 carryover balance is not reflected in the first new money figure but is reflected in the next new money figure of $ 7,300, by virtue of augmenting the balance of funds available for gambling by the $ 800 carryover after the first gambling transaction. ↩
2. The computer report from the Golden Nugget reflects a loss of $ 20,900. Respondent's computation will not be adjusted as the error is in petitioner's favor. ↩
3. Respondent inadvertently omitted the June 4, 1986, buy-in of $ 12,200 and loss of $ 12,300 reported by Caesars. This has no impact on the amount of new money. ↩
4. Caesar's records reflect this loss as occurring on July 25, 1986. ↩
5. The Golden Nugget computer records show this as a win of $ 1,600. Respondent's mischaracterization of this amount as a loss has no impact on new money.↩
3. The fact that petitioner's gambling activity resulted in net losses has no impact on respondent's computation because gambling losses are only deductible to the extent of gambling winnings. Sec. 165(d).↩
4. Respondent's calculation for 1985 determined that petitioner spent $ 9,000 in "new money" after Nov. 28, 1985. Since our adjustment adds $ 14,000 to the Nov. 28, 1985 balance, none of the $ 9,000 should be considered new money and $ 5,000 should be added to the beginning balance on Jan. 1, 1986. This $ 5,000 reduces "new money" for 1986 by $ 5,000. Our adjustment adding $ 11,400 to the ending balance for Mar. 9, 1986, eliminates all of the $ 10,490 in "new money" that respondent calculated was spent by petitioner subsequent to Mar. 9, 1986. Thus, the "new money" calculated for 1986 should be reduced by $ 15,490 ($ 5,000 plus $ 10,490).↩